# In the United States Court of Appeals for the District of Columbia Circuit

Nos. 21-1126, *et al.* (CONSOLIDATED)

———————

SOLAR ENERGY INDUSTRIES ASSOCIATION, *et al.*,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON REMAND FROM THE UNITED STATES SUPREME COURT

———————

**SUPPLEMENTAL BRIEF OF RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

———————

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Jared B. Fish
  Attorney

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

JANUARY 15, 2025

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................... 1

ARGUMENT ................................................................ 3

I.   FERC's interpretation of a "facility's" "power production capacity"
     is the best reading of the statute ........................................... 3

     A.   The original panel unanimously, and correctly, concluded that
          the statute requires assessing the Broadview Facility's power
          production capacity inclusive of the inverters ............................ 4

     B.   Regardless of the meaning of the term "capacity," FERC's
          conclusion that the Broadview Facility has a power production
          capacity of 80 megawatts is the best reading of the statute ........ 9

     C.   The Utilities' emphasis on other statutory provisions and even
          different statutes distracts
          from the best reading of FPA §3(17) ......................................... 14

     D.   The panel majority correctly determined that PURPA's
          structure, purpose, and legislative history support FERC's
          interpretation of the statute ..................................................... 15

     E.   The dissent's interpretation of a "facility's" "power
          production capacity" is not the best one ................................... 17

II.  FERC's interpretation of a "facility's" "power production capacity"
     is persuasive under *Skidmore* ........................................................... 21

CONCLUSION ............................................................... 27

# Table of Authorities

**Court Cases:** **Page(s)**

*Amerada Hess Pipeline Corp. v. FERC*,
117 F.3d 596 (D.C. Cir. 1997)......................................................24

*Atl. Richfield Co. v. Bonneville Power Admin.*,
818 F.2d 701 (9th Cir. 1987) .........................................................12

*Cent. Lincoln Peoples' Util. Dist. v. Johnson*,
735 F.2d 1101 (9th Cir. 1984)........................................................12

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ........................................................................1

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) .......................................................................15

*Conn. Valley Elec. Co. v. FERC*,
208 F.3d 1037 (D.C. Cir. 2000).....................................................16

*Kiewit Power Constructors Co. v. Sec'y of Labor*,
959 F.3d 381 (D.C. Cir. 2020)........................................................15

*Lissack v. Comm'r of Internal Revenue*,
No. 21-1268 (D.C. Cir. Jan. 10, 2025) ..........................................21

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......................................1–3, 12, 21–22, 24–26

*Murray Energy Corp. v. FERC*,
629 F.3d 231 (D.C. Cir. 2011)........................................................23

*Sacramento Mun. Util. Dist. v. FERC*,
616 F.3d 520 (D.C. Cir. 2010)........................................................10

# Table of Authorities

COURT CASES:                                                          PAGE(S)

*Save Our Sebasticook v. FERC,*
    439 F.3d 379 (D.C. Cir. 2005)............................................................24

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ............................................................................11

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944)................................................... 3, 21–22, 24–25

*Solar Energy Indus. Ass'n v. FERC,*
    59 F.4th 1287 (D.C. Cir. 2023).........2, 5–6, 8–9, 11, 13, 15–20, 25, 27

*Solar Energy Indus. Ass'n v. FERC,*
    80 F.4th 956 (9th Cir. 2023) ..........................................................24

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997) .......................................................16

*Van Buren v. United States,*
    593 U.S. 374 (2021) ..........................................................................9

STATUTES:

16 U.S.C. §796(17)............................................................................ 4–5, 25

26 U.S.C. §48E(a)(2)...........................................................................14–15

Public Utility Regulatory Policies Act ("PURPA") of 1978,
    Pub. L. 95–617, 92 Stat. 3117 ...........................................................2

# Table of Authorities

ADMINISTRATIVE CASES:                                                    PAGE(S)

*Broadview Solar, LLC,*
    174 FERC ¶61,199 (2021) **("Rehearing Order I")**.........5, 6, 11, 13–14, 23, 27

*Broadview Solar, LLC,*
    175 FERC ¶61,228 (2021) **("Rehearing Order II")** ...................5, 8, 11,
    14, 19–20, 23–24

*Malacha Power Project, Inc.,*
    41 FERC ¶61,350 (1987) ...................................................................24

*Occidental Geothermal, Inc.,*
    17 FERC ¶61,231 (1981).............................................................23, 26

*Penntech Papers, Inc.,*
    48 FERC ¶61,120 (1989) ...................................................................24

*Turner Falls Ltd. P'Ship,*
    53 FERC ¶61,075 (1990)............................................................. 12, 24

LEGISLATIVE HISTORY:

H.R. Rep. No. 95-1750 (1978) (Conf. Rep.) .............................................. 16

OTHER AUTHORITIES:

*Capacity*, U.S. DEPARTMENT OF ENERGY,
    https://perma.cc/9L6R-H2GH............................................................9

*Capacity; Generator Capacity*, U.S. ENERGY INFO. ADMIN.,
    https://perma.cc/2FXH-DS2N; https://perma.cc/Y9ST-9TSH .........9

Justice Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) .......................8

## Glossary

| | |
|---|---|
| FERC Br. | April 12, 2022-filed Brief of the Federal Energy Regulatory Commission |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| PURPA | Public Utility Regulatory Policies Act of 1978 |
| Qualifying Facility | A small power production facility that meets PURPA's fuel use, size, and other requirements |
| Rehearing Order I | *Broadview Solar, LLC*, 174 FERC ¶61,199 (Mar. 19, 2021), JA189–227 |
| Rehearing Order II | *Broadview Solar, LLC*, 175 FERC ¶61,228 (June 17, 2021), JA274–95 |
| P | Internal paragraph number in a FERC order |
| Utilities | Petitioners Edison Electric Institute and NorthWestern Corporation d/b/a NorthWestern Energy |
| Utilities Opening Br. | April 12, 2022-filed opening brief of the Utilities |
| Utilities Reply Br. | April 12, 2022-filed reply brief of the Utilities |

# In the United States Court of Appeals for the District of Columbia Circuit

Nos. 21-1126, *et al.* (CONSOLIDATED)

───────────

SOLAR ENERGY INDUSTRIES ASSOCIATION, *et al.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

───────────

ON REMAND FROM THE UNITED STATES SUPREME COURT

───────────

## SUPPLEMENTAL BRIEF OF RESPONDENT FEDERAL ENERGY REGULATORY COMMISSION

───────────

## INTRODUCTION

On June 28, 2024, the Supreme Court issued its decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, which overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The original panel to consider the matter here on review affirmed orders of Respondent Federal Energy Regulatory Commission ("Commission" or "FERC") interpreting the meaning of a "facility's" "power production

capacity," invoking *Chevron*. *See Solar Energy Indus. Ass'n v. FERC*, 59 F.4th 1287, 1292–94 (D.C. Cir. 2023). Pursuant to the Court's November 20, 2024 Order, the Commission submits this supplemental brief assessing the impact, if any, of *Loper Bright* on the panel's determination.

*Loper Bright* does not affect the panel's determination in *Solar Energy*. While the *Solar Energy* majority nominally deferred to the Commission's interpretation of the Public Utility Regulatory Policies Act ("PURPA") of 1978, Pub. L. 95–617, 92 Stat. 3117, because the Court deemed the statute to be ambiguous, the Court conducted a *de novo*-type statutory analysis. *See* 59 F.4th at 1292–94. The Court *independently* assessed the statute's text, structure, purpose, and legislative history—precisely the mode of analysis *Loper Bright* endorses when a court, rather than an agency, is tasked with resolving a statutory ambiguity. *Loper Bright*, 603 U.S. at 400–01. Indeed, *because* of its assessment of the statute, the panel majority held that FERC's interpretation of the phrase in dispute—what constitutes a "facility's" "power production capacity"—was "eminently reasonable" and "well-supported by the statute's text, structure, purpose, and legislative history." 59 F.4th at 1292–94; *id.* at 1292 (finding FERC's interpretation to

2

be "amply supported"). Petitioners Edison Electric Institute and NorthWestern Corporation (the "Utilities") are therefore wrong to suggest that the panel majority "relieve[d] [itself] of its obligation to independently interpret the statute." *Cf.* Utilities Supp. Br. 4 (quoting *Loper Bright*, 603 U.S. at 400).

Further fortifying the original panel's determination, under *Loper Bright*, FERC's interpretation of a "facility's" "power production capacity" has all the hallmarks that give it the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). It was issued roughly contemporaneously with the enactment of PURPA, has remained consistent for over four decades, is rooted in FERC's specialized experience administering PURPA, and reflects FERC's thorough and valid reasoning.

## Argument

## I. FERC's interpretation of a "facility's" "power production capacity" is the best reading of the statute

The panel majority held FERC's interpretation of a "facility's" "power production capacity" to be "eminently reasonable" after marshaling the traditional tools of statutory construction. 59 F.4th at 1292–94. That approach adheres to the *de novo*-style review endorsed by the Supreme Court.

*See Loper Bright*, 603 U.S. at 403 ("Courts interpret statutes … based on the traditional tools of statutory construction[.]").  Because the panel majority's analysis—and thus its conclusion upholding FERC's orders—is consistent with the mode of inquiry established by *Loper Bright*, no further review is warranted.

> **A.** **The original panel unanimously, and correctly, concluded that the statute requires assessing the Broadview Facility's power production capacity inclusive of the inverters**

**1.** PURPA provides that a "small power production facility" is a "qualifying facility" if, as pertinent here, the "facility … has a power production capacity" that does not exceed 80 megawatts.  FPA §3(17)(A), 16 U.S.C. §796(17)(A) (added by PURPA §201).  FERC determined that a "facility's" "power production capacity" means "the facility's net output" to the electric grid, *Broadview Solar, LLC*, 174 FERC ¶61,199, PP 25–26 (2021) ("Rehearing Order I"), JA201–02, an interpretation it deemed "the best interpretation" of the statute, *id*. P 26, JA202; *accord Broadview Solar, LLC*, 175 FERC ¶61,228, P 20 (2021) ("Rehearing Order II"), JA285.

It is undisputed that the Broadview Facility can produce no more than 80 megawatts of power for the electric grid at any one time.  *See Solar*

*Energy*, 59 F.4th at 1293; *id.* at 1300 (Walker, J., dissenting) ("[O]nly … 80

megawatts of [alternating current] power [is] sent to the grid[.]"); FERC

Br. 13 (citing Rehearing Order I P 5, JA191); Utilities Opening Br. 10 ("[N]o

more than 80 megawatts of power will be delivered from the Broadview

Project to the grid at any one time."). The Facility's solar array and battery

have capacities of 160 megawatts and 50 megawatts, respectively, but both

send their (direct current) power to the Facility's inverters before it leaves

the Facility, and the inverters are capped at 80 megawatts of (alternating

current) power. FERC Br. 12–13, 60. Accordingly, FERC concluded—and

the panel majority affirmed, *Solar Energy*, 59 F.4th at 1292–94—that the

Broadview Facility is a "qualifying facility."

**2.** The Utilities' view that the Broadview Facility's power production

capacity is a measure of the total direct current it generates—i.e., 160

megawatts measured at the solar array—finds no support in either the panel

majority's opinion *or* that of the dissent. *Cf.* Utilities Supp. Br. 9–10

(incorporating by reference Utilities Opening Br. 26 & n.19 (*accord* Utilities

Reply Br. 5) asserting that "the Broadview Project can create 160 megawatts

of power"). All three judges agreed with FERC that FPA §3(17)'s reference

to the "power production capacity" of a "facility"—as opposed to the power production capacity of its generation unit (i.e., the solar array)—accounts for *all* of a facility's component parts as they work together as a whole. 59 F.4th at 1292; *id.* at 1299 (Walker, J., dissenting). The panel majority found this interpretation to be "eminently reasonable," *id.* at 1292, while the dissent deemed it the *only* reasonable reading, *see id.* at 1299.

As the dissent explained, "[t]he statute's focus on a 'facility' suggests that we should assess the production capacity of a power plant *as a whole*, not the capacity of an individual component." *Id.* Underscoring the point, the dissent found that the court "should not look only at the capacity of Broadview's 160-megawatt solar array" because "[t]hat approach would ignore the facility's other components—for instance, the inverters that limit the array's output to the grid." *Id.* That is the polar opposite of the Utilities' view, which is that the inverters' "limit[ation] [on] the [Broadview] [F]acility's output" "does not alter the fact that the facility can still create 160 megawatts of power." Utilities Opening Br. 29–30; Utilities Reply Br. 5–6 (incorporated by reference at Utilities Supp. Br. 9–10).

**3.** In any event, the Utilities are incorrect. Their reasoning goes like this: The Broadview Facility's solar array is part of the Facility; the solar array generates up to 160 megawatts of power; therefore, the Facility has a power production capacity of 160 megawatts. *See* Utilities Reply Br. 5. But if Congress had intended to focus on the power production capacity of a facility's generation unit rather than of the facility itself, it would have said so. *See Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 974 (D.C. Cir. 2011) (courts do not "add[] terms to the statute that Congress has not included"); FERC Br. 51–52. What Congress *did* say is that a "facility" must "produce[] electric energy solely by the use, as a primary energy source, of … renewable resources" (like solar power). 16 U.S.C. §796(17)(A), (A)(i). Congress separately provided that a "facility … [must] ha[ve] a power production capacity which … is not greater than 80 megawatts." §796(17)(A), (A)(ii). Congress did *not*, however, provide that the facility's *generation component* that uses renewable resources must have a power production capacity of no greater than 80 megawatts. FERC Br. 51–52.

7

FERC's approach is faithful to Congress' charge to assess the power production capacity of the whole facility. It "takes into consideration both the Broadview Facility's solar array"—which is necessary to the Facility's generation of power—"*and* its inverters (and everything in between)." FERC Br. 45 (citing Rehearing Order II PP 17, 30, JA282–83, 290–91). The Utilities therefore err in criticizing FERC for "attribut[ing] controlling significance to just one subcomponent of the [Broadview] facility: the inverters." Utilities Supp. Br. 18.

The Commission's plain-text application of the statute is unaffected by the fact that both direct current and alternating current are forms of power. *Cf.* Utilities Supp. Br. 10–11. The power production capacity of the Broadview Facility taken as a whole is—due to the inverters—a maximum 80 megawatts of alternating current. *Solar Energy*, 59 F.4th at 1292–93. The fact that alternating current is the only "grid-usable power" (*id.* at 1292) serves only to fortify the conclusion that the inverters—which convert the Facility's direct current into alternating current—must be accounted for in calculating the (whole) Facility's power production capacity. *See* FERC Br. 26 (citing Rehearing Order I PP 24–26, 32–33, JA201–02, 206–07).

In short, contra the Utilities' approach, the panel correctly deemed it "eminently reasonable" to conclude that "Broadview's inverters work with the solar array and battery *as an integral component*" to produce the Facility's power, *Solar Energy*, 59 F.4th at 1292 (emphasis added), a point endorsed by the dissent, *id.* at 1299.

**B.** **Regardless of the meaning of the term "capacity," FERC's conclusion that the Broadview Facility has a power production capacity of 80 megawatts is the best reading of the statute**

**1.** Nor do the Utilities gain traction by focusing on generic dictionary definitions of the words "power," "production," and "capacity." *See* Utilities Supp. Br. 10. "Where the [statutory] text is addressing a scientific or technical subject, a specialized meaning is to be expected." Justice Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73, 75 (2012). Thus, courts assess statutory terms in "the way that an *appropriately informed* speaker of the language would understand the[ir] meaning," "tak[ing] note of terms that carry technical meanings." *Van Buren v. United States*, 593 U.S. 374, 388 (2021) (cleaned up; emphasis added).

The Utilities define "capacity" according to a generic definition, which they posit is the "maximum … level of production."  Utilities Supp. Br. 10. But the *technical*, industry-specific definition of "capacity" is "[t]he maximum *output*, commonly expressed in megawatts (MW), that generating equipment can *supply to system load*, adjusted for ambient conditions." *Capacity*; *Generator Capacity*, U.S. Energy Info. Admin. (emphasis added), https://perma.cc/2FXH-DS2N; https://perma.cc/Y9ST-9TSH; *see also Capacity*, U.S. Department of Energy, https://perma.cc/9L6R-H2GH (defining "capacity" to mean "Maximum Power *Output*," which "helps utilities project just how big of an electricity *load* a generator can handle" (emphasis added)); FERC Br. 40–41 (offering these technical definitions).  "'Load' refers to end-use customers of the transmission system, the primary source of 'demand' for electric energy." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 524 n.4 (D.C. Cir. 2010); FERC Br. 41.

Contrary to the Utilities' assertion (Utilities Supp. Br. 11), FERC *did* define the term "capacity" in just this way in the orders on review:  FERC explained that "the term 'capacity' is generally equated to 'output.'" Rehearing Order I P 25, JA201–02; *see also* FERC Br. 39 (citing Rehearing

Order II P 17, JA282–83, for the proposition that FERC credits the "maximum *output* that the facility as a whole can produce" (first emphasis added; second emphasis omitted)).  And because the statute is concerned with the "facility's" "capacity" rather than the capacity of its generation component (the solar array), FERC correctly determined that "capacity" refers to the Broadview Facility's output "to the grid."  Rehearing Order I P 25, JA201–02.  Accordingly, FERC concluded that "power production capacity means output in a form useful to an interconnected entity[.]"[1] Rehearing Order II P 18, JA283; FERC Br. 43.

The Utilities also err in dismissing FERC's definition of "capacity" as "ahistorical."  *Cf*. Utilities Supp. Br. 12.  Actually, courts for *four decades*

---

[1]     In its original brief, FERC observed that the orders on review did not cite an industry-specific definition of "capacity."  *See* FERC Br. 40 n.9.  But contrary to Petitioners' assertion and the Court's discussion, the industry-specific definition *was* "a basis for the Commission's decision": FERC in its orders defined "capacity" in terms of a facility's "output," which is consistent *with* the industry-specific definition.  *Cf. Solar Energy*, 59 F.4th at 1292.  Indeed, FERC's brief explained that it was including the industry-specific definition to "*support* the Commission's statutory interpretation"—not to supply a *new* one.  FERC Br. 40 n.9 (emphasis added).  Consequently, the Court should credit FERC's definition of "capacity" as meaning a facility's "output" to the grid.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87, 95 (1943).

have recognized that, "[i]n electrical ratemaking parlance, …. '[c]apacity' is the maximum energy that the electric generating system may provide at any given moment …. to meet a customer's requirements"—i.e., output to the grid. *Atl. Richfield Co. v. Bonneville Power Admin.*, 818 F.2d 701, 704 n.2 (9th Cir. 1987); *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1121 (9th Cir. 1984) ("'Capacity' is the maximum output of the system at a given moment" in order "to meet … electricity demand[.]").

For its part, FERC has long advanced this definition of "capacity" in interpretating the term "power production capacity" in FPA §3(17).  More than three decades ago FERC explained that "qualifying capacity" means "the facility's net electric power production capacity." *Turner Falls Ltd. P'ship*, 53 FERC ¶61,075 at p.61,225 (1990); *see* FERC Br. 53.  As the agency Congress tasked with implementing PURPA, FERC was—and remains—well suited to articulate the technical definition for this technical term.  *See Loper Bright*, 603 U.S. at 394 (courts should "seek aid from the interpretations of those responsible for implementing particular statutes"); *see also infra* pp.24–25.

Given all this, it is little surprise that, until this litigation, Petitioner NorthWestern espoused the view that the "[n]ameplate *[c]apacity* of [a] [f]acility" means "the sum of the Alternating Current (AC) *output* ratings of the inverters or generating units[.]" NorthWestern Energy, *Interconnection Procedures for Small Generator Facilities Other Than Qualifying Facilities*, §2.17 (2019), https://perma.cc/YVM8-WEZC (emphasis added). Not just that: NorthWestern's interconnection agreement *with the Broadview Facility in this very matter* provides that "the total size of the [p]roject will be 80 [megawatts] *based on the max output of the inverters*." Rehearing Order I P 33 n.92, JA207 (emphasis added) (cleaned up).

**2.** Even were the panel to adopt the Utilities' generic definition of "capacity" as meaning the "maximum … level of production," that would not change the result. Because, as discussed *supra* pp.6–9, the Broadview Facility's "power production capacity" is a function of the power the whole facility produces (i.e., inclusive of the role of the inverters), the (whole) Facility's capacity maxes out at 80 megawatts of alternating current. *Solar Energy*, 59 F.4th at 1293; FERC Br. 41 (citing Rehearing Order II P 28, JA289–90).

### C. The Utilities' emphasis on other statutory provisions and even different statutes distracts from the best reading of FPA §3(17)

The Utilities cast about for evidence in other PURPA provisions—even other statutes altogether—to explain away Section 3(17)'s plain meaning. For example, they observe that PURPA (which added FPA §3(17)) elsewhere uses the term "'transmission capacity' to refer to the ability of facilities to transmit or deliver power, as distinct from producing or generating power." Utilities Supp. Br. 13. But here, the Commission explained that the terms "'production' and 'delivery' … are overlapping, at least in this context." Rehearing Order I P 25, JA201–02; *see* FERC Br. 39–40. Indeed, it makes sense that a facility's capacity to produce power *equals* the power it can deliver to the electric grid (here, 80 megawatts).

Nor do the Utilities gain traction by citing an entirely different statute. 26 U.S.C. §48E(a)(2) (2022) defines "'qualified facility' by reference to 'maximum net output … as measured in alternating current.'" Utilities Supp. Br. 13 (emphasis omitted) (quoting §48E(a)(2)). If anything, §48EA(a)(2) makes explicit, rather than undercuts, the long-held view that the relevant measure of a generator's power production capacity is its (alternating current) output to the grid. And even were that not the case, one

statute's definition of a term does not override the best reading of another statute's use of a term. *Cf. Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says *there*." (emphasis added)).

**D. The panel majority correctly determined that PURPA's structure, purpose, and legislative history support FERC's interpretation of the statute**

The panel majority also correctly determined that PURPA's structure, purpose, and legislative history support FERC's interpretation of FPA §3(17) (added by PURPA). *Solar Energy*, 59 F.4th at 1292–93; *see Kiewit Power Constructors Co. v. Sec'y of Labor*, 959 F.3d 381, 395 (D.C. Cir. 2020) ("To discern the Congress's intent, we generally examine the statutory text, structure, purpose and its legislative history." (cleaned up)).

**1.** The panel majority correctly found—on its own review—that FERC's interpretation "brings various provisions of PURPA into harmony." *Solar Energy*, 59 F.4th at 1292. The benefit of securing qualifying facility status is the mandatory purchasing requirement. *Id.* "But [that] requirement only applies to grid-usable power—meaning [alternating current] power." *Id.* Thus, focusing on a facility's net output of alternating current—here, 80

15

megawatts—to determine qualifying status aligns the measure of a facility's power production capacity with the "benefits available to those qualifying facilities." *Id*. at 1293.

**2.** The panel majority also correctly found—again, on its own review—that FERC's focus on net output is "'consistent with the statutory purpose' of PURPA." *Id*. (quoting *Troy Corp. v. Browner*, 120 F.3d 277, 285 (D.C. Cir. 1997)). PURPA's goal is "'to encourage the development of … small power production facilities' and promote the use of alternative energy sources, such as solar." *Id*. (quoting *Conn. Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1045 (D.C. Cir. 2000)). As the panel majority concluded, it "would be inconsistent with that goal" to "[e]xclud[e] facilities from qualifying facility status because their component parts have individual production capacities over 80 [megawatts], even though the overall facility," like the Broadview Facility, "cannot send out more than 80 [megawatts] to the grid[.]" *Id*.

**3.** Finally, the panel majority correctly found—again, after its own investigation—that FERC's statutory interpretation "is … consistent with the legislative history." *Id*. As the House Committee Report explains, "'[t]he power production capacity of the facility means the rated capacity *of*

16

*the facility*'"—i.e., not of the facility's generation unit.  *See id.* (emphasis added) (quoting H.R. Rep. No. 95-1750, at 89 (1978) (Conf. Rep.)).

In short, because the panel majority applied precisely the mode of analysis *Loper Bright* requires, there exists no basis for the Court to revisit its decision *due to Loper Bright*.

### E. The dissent's interpretation of a "facility's" "power production capacity" is not the best one

Respectfully, the dissent's reading of FPA §3(17)—which is not advanced by the Utilities[2]—is in tension with the statutory text.

The dissent posited that the Broadview Facility's power production capacity is the 80 megawatts of alternating current produced at the inverters, plus the 50 megawatts of direct current stored in the battery.  59 F.4th at 1301 (Walker, J., dissenting).  But that approach confuses electric generation with power production capacity and double counts the same power.

---

[2]    In fact, the Utilities run away from the dissent's analysis, arguing that "*[e]ven if* the statute referred to the concept of 'useful' power"—a concept credited by the dissent—that would not affect the Utilities' argument that the Broadview Facility is not PURPA-qualifying.  Utilities Supp. Br. 17 (emphasis added) (citing 59 F.4th at 1299 (Walker, J., dissenting)).

*First*, the dissent reasoned that the 50 megawatts of battery-stored power is additive to the 80 megawatts of inverted power because the battery "lets a solar facility send power to the grid at times when it otherwise could not"—i.e., when the solar array produces little or no power because it is cloudy or dark. *Id*. at 1299. But that just shows that the battery maximizes the Broadview Facility's ability to generate power *over time*, which is measured in megawatt-*hours*. FERC Br. 68–71 (citing Rehearing Order II PP 28 & n.99, JA289–90). That is, the battery enhances Broadview's capacity *factor*, which is a measure of a facility's efficiency in generating electricity. *Id*. at 69–70 (citing Rehearing Order II PP 28–29, JA289–90). Power production *capacity*, by contrast, is the amount of instantaneous power a facility produces and is measured in megawatts. FERC Br. 6 n.2, 68–69. That the battery stores power for later use does not speak to the amount of instantaneous power the Facility *as a whole* produces, which is never more than 80 megawatts.

*Second*, the dissent reasoned that the Broadview Facility "produces 80 megawatts of inverted [alternating current] power that is delivered to the grid *while* producing 50 megawatts of not-yet-inverted [direct current] power to

charge its battery." 59 F.4th at 1301. That approach, however, runs into the same issue. To be sure, the dissent started off on the right foot by acknowledging that the Broadview Facility as a whole produces 80 megawatts of alternating current at any one time (measured at the inverters). *See id.* at 1301. But that 80 megawatts of inverted power includes both power generated at the solar array *and* power stored in the battery: The battery's power derives from the solar array, and the solar array and battery both send their power to the 80-megawatt inverters. FERC Br. 59–60 (citing Rehearing Order II P 34, JA292).

Consequently, it is inappropriate to add to the power produced by the whole Facility (80 megawatts) the power stored in the battery (50 megawatts). The former metric measures power production in terms of all the Facility's component parts—the solar array, inverters, *and* battery—as they work together as a whole. The latter metric measures power production in terms of one of those components only—the battery. But the battery's contribution has already been credited in the 80-megawatt figure: The whole Broadview Facility has a power production capacity of 80 megawatts in part due to the battery's contribution of up to 50 megawatts. Accordingly,

aggregating the two amounts (80 + 50), as the dissent did (59 F.4th at 1301), does not reveal the Facility's power production capacity so much as it double counts the battery's contribution *to* the Facility's power production capacity.

Put another way, at no point can the Broadview Facility produce more than 80 megawatts for the grid and, at several points, the energy stored in the battery would be necessary to meet that level of production.

The dissent's analogy to a lumberjack is inapposite. The dissent reasoned that a lumberjack who chops two trees into sellable timber a day, but who can take only one tree's worth to market a day, still has a production capacity of two trees per day. *Id*. The dissent found that the Broadview Facility similarly "produces 80 megawatts of power for the inverters and 50 megawatts of power for the battery," even though only 80 megawatts is immediately delivered to market. *Id*. The analogy might be apt if, instead of producing 80 megawatts at the inverters, the Broadview Facility produced 130 megawatts at the inverters, but 50 megawatts were stored in a battery immediately after leaving the Facility. In that scenario, the Broadview Facility would produce 130 megawatts of power, even if only 80 of those megawatts were immediately delivered to "market." But once it is

20

accepted—as the panel unanimously agreed—that the dispositive question is how much power the Facility *as a whole* produces—i.e., accounting for all its component parts—then the Facility's power production capacity is manifestly 80 megawatts:  That is the maximum power the Facility produces at any one time.

## II. FERC's interpretation of a "facility's" "power production capacity" is persuasive under *Skidmore*

FERC's interpretation of a "facility's" "power production capacity" is the best reading of the statute.  But even if there were doubt on this score, the panel should still uphold FERC's interpretation due to its "power to persuade."  *See Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 140).  An agency's interpretation is persuasive if:  (1) it is issued "roughly contemporaneously with enactment of the statute," (2) has "remained consistent over time," (3) is "based upon … [an agency's] specialized experience," and (4) reflects the agency's "thorough" and "valid[] … reasoning."  *See id*. at 386–88 (quoting *Skidmore*, 323 U.S. at 139–40); *see also Lissack v. Comm'r of Internal Revenue*, No. 21-1268, slip op. 23–24 (D.C. Cir. Jan. 10, 2025) (Under *Skidmore*, courts assess "the persuasive value of an agency's interpretation … based on 'the thoroughness evident in its

consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" (quoting *Skidmore*, 323 U.S. at 140, and reaffirming pre-*Loper Bright* interpretation on remand from the Supreme Court).

The Commission's interpretation of the statute here checks all four boxes. *First*, FERC issued its interpretation of FPA §3(17) in *Occidental Geothermal, Inc.*, 17 FERC ¶61,231 at pp.61,444–45 in 1981—approximately three years after PURPA's enactment. (discussed at Rehearing Order I P 28, JA203–04; Rehearing Order II P 18, JA283). There, FERC explained that a "qualifying small power production facility" is one whose "maximum net output" is 80 megawatts. *Id.* at pp.61,444–45. That pronouncement was made "roughly contemporaneously" with PURPA's enactment. *See Loper Bright*, 603 U.S. at 386.

The Utilities' contrary assertion that the orders on review mark the first time FERC has advanced its current statutory interpretation is incorrect. *Cf.* Utilities Supp. Br. 6. Notwithstanding the novel technical design of the Broadview Facility—i.e., its incorporation of a battery—the Commission

expressly applied its traditional *legal* interpretation of the statute.  FERC

Br. 55 (citing Rehearing Order II P 18, JA283).

*Second*, FERC's interpretation of a "facility's" "power production

capacity" has been remarkably consistent over 40 years.  After issuing

*Occidental*, FERC repeatedly and consistently reaffirmed that reading over

the next several decades.  *See, e.g.*, *Turner Falls*, 53 FERC ¶61,075 at

p.61,225; *Penntech Papers, Inc.*, 48 FERC ¶61,120 at p.61,423 (1989);

*Malacha Power Project, Inc.*, 41 FERC ¶61,350 at p.3 (1987).  The *only*

exception was the initial order in the matter here on review—which the

Commission promptly corrected on rehearing.  *See* FERC Br. 18.  It would be

odd indeed if an agency's lone error eviscerated the relevance of its prior,

consistent view.  It would be stranger still if, as the Utilities urge, correcting

that error in the same proceeding—as FERC did here on rehearing—evinced

inconsistent "flip-flopp[ing]."  *Cf.* Utilities Supp. Br. 7.  Indeed, FERC's

course-correction in the orders on review punctuates its commitment *to*

consistency.  *Cf. Murray Energy Corp. v. FERC*, 629 F.3d 231, 236 (D.C. Cir.

2011) (an earlier order's findings are "beside the point" in light of a lawful

subsequent order on rehearing); *Save Our Sebasticook v. FERC*, 439 F.3d

23

379, 381 (D.C. Cir. 2005) (statutory rehearing requirement "enables the Commission to correct its own errors").

*Third*, FERC's interpretation is rooted in its "specialized experience." *See Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139–40)). Congress delegated to FERC the task of determining which facilities are "*qualifying* small power production facilities." *See* 16 U.S.C. §796(17)(C) (emphasis added). Where "FERC is entrusted with administering" a statute, it "has an expertise in the field based on that jurisdiction." *Cf. Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 601 (D.C. Cir. 1997) (concerning administration of regulations). And it cannot seriously be argued that the Federal *Energy* Regulatory Commission lacks expertise in the field of *energy* regulation. *Cf. Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 984–85 (9th Cir. 2023) (FERC's implementation of another part of PURPA falls within FERC's "technical expertise" (cleaned up)). The Utilities' contention that FERC has applied no "specialized experience" worthy of the Court's respect disregards both Congress' intent and common sense. *Cf.* Utilities Supp. Br. 5 (cleaned up).

*Fourth*, FERC's interpretation is the product of its "thorough" and "valid[] … reasoning." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 140). Shortly after PURPA was enacted, FERC articulated a rational basis for assessing a facility's power production capacity as its total output to the grid. Summoning its technical knowledge of generation facilities' operations, FERC explained that it would make little sense to measure power production capacity in terms of just one of a facility's component parts. *See Occidental*, 17 FERC ¶61,231 at p.61,445. That is because some components might have larger rated capacities than others, meaning an individual component's rated capacity—e.g., the 160-megawatt solar array here—is a poor measure of the *facility*'s power production capacity. *Id.*; *see Solar Energy*, 59 F.4th at 1293. The Commission reaffirmed and elaborated on this interpretation in subsequent orders over four decades. *Supra* p.23.

The Utilities' rejoinder that FERC's original appellate brief in this matter advanced a new rationale absent from FERC's orders is meritless. *Cf.* Utilities Supp. Br. 7. As discussed *supra* pp.10–11, with respect to the term "capacity," FERC's brief articulated a definition that matches the definition

FERC provided *in its orders*.  And, in any event, irrespective of the meaning of "capacity," FERC defended its orders on the independent ground—also asserted in its orders—that a measure of a "facility's" "power production capacity" must account for a facility's component parts as they *work together as a whole*.  FERC Br. 26 (citing Rehearing Order I PP 24–26, 32–33, JA201–02, 206–07).  That is precisely the interpretation FERC first advanced more than 40 years ago and adhered to in the orders on review.

Accordingly, under *Loper Bright*, FERC's interpretation of FPA §3(17)'s reference to a "facility's" "power production capacity" is persuasive of the statute's meaning.  *See Loper Bright*, 603 U.S. at 388.

## Conclusion

The Court should deny the petitions for review, affirm its decision in *Solar Energy*, and reaffirm FERC's "eminently reasonable" and "well-supported" statutory interpretation. *See* 59 F.4th at 1292–94.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8101
jared.fish@ferc.gov

January 15, 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation established by this Court's order of November 20, 2024 because this brief contains 4,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Supra 14-point font using Microsoft Word 365.

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-8101
E-mail: Jared.Fish@ferc.gov

January 15, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on January 15, 2025. Participants in the case will be served by the appellate CM/ECF system.

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-8101
E-mail: Jared.Fish@ferc.gov