# In the United States Court of Appeals for the District of Columbia Circuit

SOLAR ENERGY INDUSTRIES ASSOCIATION,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

On Remand from the United States Supreme Court

On Petitions for Review of Orders of the Federal
Energy Regulatory Commission

## SUPPLEMENTAL BRIEF OF *AMICI* RENEWABLE ENERGY ASSOCIATIONS IN SUPPORT OF RESPONDENT

John D. Burns
General Counsel
CAROLINAS CLEAN ENERGY
BUSINESS ASSOCIATION
811 Ninth Street Ste. 120-158
Durham, NC 27705
919-306-6906
counsel@carolinasceba.com

*Counsel for Amicus Curiae
Carolinas Clean Energy Business
Association*

Kevin Poloncarz
Jayni Hein
Timothy Duncheon
COVINGTON & BURLING LLP
415 Mission Street, 54th Floor
San Francisco, CA 94105-2533
(415) 591-7070
kpoloncarz@cov.com

*Counsel for Amicus Curiae Solar
Energy Industries Association*

(Additional counsel on the
following page)

Irion A. Sanger
SANGER LAW, PC
4031 SE Hawthorne Blvd.
Portland, OR 97214
(503) 756-7533
irion@sanger-law.com

*Counsel for Amicus Curiae
Community Renewable
Energy Association*


Alyssa Forest
Policy and Regulatory Affairs
Director
OREGON SOLAR + STORAGE
INDUSTRIES ASSOCIATION
PO Box 14927
Portland, OR 97293
(916) 960-8884
alyssa@orssia.org

*Counsel for Amicus Curiae Oregon
Solar + Storage Industries
Association*

Whit Cox
Regulatory Director
SOUTHERN RENEWABLE ENERGY
ASSOCIATION
11610 Pleasant Ridge Road, Suite
103 # 176
Little Rock, AR 72223
(501) 701-0874
whit@southernrenewable.org

*Counsel for Amicus Curiae
Southern Renewable Energy
Association*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel certifies the following:

Solar Energy Industries Association has no outstanding shares or debt securities in the hands of the public, and it does not have a parent company. No publicly held company has a 10% or greater ownership interest in Solar Energy Industries Association.

Carolinas Clean Energy Business Association ("CCEBA") is a 501(c)(6) organization formed under the laws of North Carolina. It has no outstanding shares or debt securities in the hands of the public, and it does not have a parent company. No publicly held company has a 10% or greater ownership interest in CCEBA.

Community Renewable Energy Association is an Oregon-based intergovernmental association, formed under Oregon Revised Statutes Sections 190.003 to 190.120, that has no parent corporation and issues no stock. No publicly held company has a 10% or greater ownership interest in Community Renewable Energy Association.

Oregon Solar + Storage Industries Association ("OSSIA") has no outstanding shares or debt securities in the hands of the public, and it

does not have a parent company. No publicly held company has a 10% or greater ownership interest in OSSIA.

Southern Renewable Energy Association has no outstanding shares or debt securities in the hands of the public, and it does not have a parent company. No publicly held company has a 10% or greater ownership interest in the Southern Renewable Energy Association.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT...................................................i

TABLE OF AUTHORITIES..................................................................iv

GLOSSARY .........................................................................................vi

INTEREST OF AMICI CURIAE...........................................................1

INTRODUCTION.................................................................................3

ARGUMENT ........................................................................................4

I.     FERC's longstanding interpretation of Section 201(17)(A) helps maintain grid reliability at the lowest system cost in the face of accelerated energy demand. .................................................4

II.    Text, structure, and longstanding practice make clear that "power production capacity" means the power production capable of being sent out to the grid................................................8

    A.    The tools of statutory interpretation make clear that this is the "best reading" of the provision.............................8

    B.    This reading is bolstered by the consistency of FERC's approach over four decades....................................................10

    C.    This "best reading" aligns with how grid operators and regulators understand "power production capacity."...........10

III.   If FERC's longstanding construction of Section 796(17)(A) is rejected, which it should not be, the remedy should be limited to minimize disruption.................................................................12

CONCLUSION ...................................................................................15

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Conn. Valley. Elec. Co. v. FERC,*
    208 F.3d 1037 (D.C. Cir. 2000) .......................................... 13

*FERC v. Mississippi,*
    456 U.S. 742 (1982)................................................... 4, 5, 9

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994) ...................................................... 13

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024)............................................ 3, 8, 10, 12

*PJM Power Providers Grp. v. FERC,*
    96 F.4th 390 (3d Cir. 2024) ............................................ 13

*Portland Gen. Elec. Co. v. FERC,*
    854 F.3d 692 (D.C. Cir. 2017) ........................................... 5

*S. Cal. Edison Co. v. FERC,*
    443 F.3d 94 (D.C. Cir. 2006) ............................................ 9

*Solar Energy Indus. Ass'n v. FERC,*
    59 F.4th 1287 (D.C. Cir. 2023)........................................... 3

*Solar Energy Indus. Ass'n v. FERC,*
    80 F.4th 956 (9th Cir. 2023) ........................................... 14

*Van Buren v. United States,*
    593 U.S. 374 (2021) ...................................................... 8

**Statutes**

16 U.S.C. § 796(17)(A) .......................................................... 3

16 U.S.C. § 824a-3(a)......................................................... 3, 6

26 U.S.C. § 2602(19) ............................................................ 7

Ark. Code Ann. § 23-18-603(9)(B) .............................................. 11

Fla. Stat. Ann. §§ 403.506(1), 403.503(17)............................... 11

Public Utility Regulatory Policies Act of 1978
    Pub L. 95-617, 92 Stat. 3117 ......................................... 1, 3, 5, 7, 9, 13

S.C. Code. Ann. 58-33-20(2)(A) .............................................. 11

**Regulatory and Administrative Materials**

*Broadview Solar LLC,*
    174 FERC ¶ 61,194 (2020)................................................... 6

*Broadview Solar LLC,*
    174 FERC ¶ 61,119 (2021)................................................... 6

*Occidental Geothermal, Inc.,*
    17 FERC ¶ 61,231 (1981)................................................... 6

*Order Addressing the Seventy-Five Megawatt Capacity Threshold
Requirement*, Nos. 2023-38-E, 2023-39-E, 2023 WL 9107270 (Dec. 28, 2023)........................................................................ 11

*PJM Interconnection, L.L.C.,*
    187 FERC ¶ 61,208 (2024)................................................ 11

Small Power Production and Cogeneration Facilities; Regulations
Implementing Section 210 of the Public Utility Regulatory Policies
Act of 1978,
    45 Fed. Reg. 12,214 (Feb. 25, 1980)..................................... 9

**Other Authorities**

*American Heritage Dictionary* (1969) ....................................... 8

*Black's Law Dictionary* (4th ed. 1968) ...................................... 8

North American Electric Reliability Corp., 2024 Long-Term
    Reliability Assessment (Dec. 2024) .................................... 4, 5

*Webster's New Twentieth Century Dictionary* (2d. ed. 1978)..................... 8

## GLOSSARY

| | |
|---|---|
| AC | Alternating Current power |
| DC | Direct Current power |
| FERC | Federal Energy Regulatory Commission |
| FERC Supp. Br. | FERC's January 15, 2025-filed supplemental brief |
| MW | Megawatt |
| PURPA | Public Utility Regulatory Policies Act of 1978 |
| Utilities | NorthWestern Corporation d/b/a NorthWestern Energy and Edison Electric Institute |
| Utilities Supp. Br. | Utilities' December 11, 2024-filed supplemental brief |

# INTEREST OF AMICI CURIAE[1]

*Amici* Solar Energy Industries Association, Carolinas Clean Energy Business Association, Community Renewable Energy Association, Oregon Solar + Storage Industries Association, and Southern Renewable Energy Association (collectively, "Renewable Energy Associations") are comprised of members that include independent power producers that develop, own, and operate "small power production facilities" under the Public Utility Regulatory Policies Act of 1978 ("PURPA"). To sell their power, these members rely on PURPA as it has been interpreted for more than four decades. They can provide insight on the long-settled industry meaning of "power production capacity" and the likely consequences if the novel definition urged by Petitioners Edison Electric Institute and NorthWestern Corporation (the "Utilities") were adopted.

Solar Energy Industries Association, the national trade association of the solar energy industry, advocates to remove market barriers preventing solar development and reduce costs, and educate the public

---

[1] *Amici* moved for leave to file this brief on February 3, 2025. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, and their counsel, contributed any money to fund preparation or submission of this brief.

on the benefits of solar energy. The Carolinas Clean Energy Business Association has over 50 members, including most of the utility-scale solar developers in North and South Carolina, and it monitors and participates in energy policymaking in both Carolinas. Community Renewable Energy Association is an intergovernmental association that advocates for community renewable energy in Oregon. The Oregon Solar + Storage Industries Association is a trade association that includes solar industry stakeholders and that promotes renewable, solar technologies. The Southern Renewable Energy Association is an industry-led initiative that promotes the responsible use and development of renewable energy in the South.[2]

---

[2] *Amici* are aware that environmental nonprofit groups also intend to submit an amicus brief in support of Respondent. However, it was not practicable for these two groups to join the same brief. The Renewable Energy Associations' brief focuses on industry-specific knowledge, experience, and expertise on power capacity and the electricity grid.

## INTRODUCTION

For nearly half a century, federal law has facilitated the construction and operation of "small power production facilit[ies]," which include renewable facilities with a "power production capacity" of "not greater than 80 megawatts," by allowing them to sell their power to electric utilities at the utilities' avoided cost rate. 16 U.S.C. §§ 824a-3(a), 796(17)(A). On February 14, 2023, this Court held that "power production capacity" reasonably means the amount of power that a facility is capable of producing to the grid. *Solar Energy Indus. Ass'n v. FERC*, 59 F.4th 1287, 1291–93 (D.C. Cir. 2023). The Supreme Court remanded for further consideration in light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Under *Loper Bright*, the Commission's interpretation is plainly the "best reading" of the statute. *Id.* at 395. This Court already found that this reading is "well-supported by the statute's text," "guided ... by the statute's structure and purpose," and aligned with the Commission's longstanding "previous approach" set out over four decades ago. *Solar Energy Indus. Ass'n*, 59 F.4th at 1291–94.

This interpretation also aligns with the technical meaning of "capacity" used in the electricity sector both when PURPA was passed

and today. The Utilities' novel alternative interpretation would impair grid reliability at a time when the nation needs additional generation capacity and frustrate a statute enacted to ameliorate the "problem[]" that "traditional electricity utilities [are] reluctant to purchase power from, and to sell power to, the nontraditional facilities." *FERC v. Mississippi*, 456 U.S. 742, 750 (1982).

The Court should deny the petitions. If the Court grants them, which is unwarranted, it should craft relief narrowly so as not to threaten longstanding reliance interests and grid reliability.

## ARGUMENT

### I. FERC's longstanding interpretation of Section 201(17)(A) helps maintain grid reliability at the lowest system cost in the face of accelerated energy demand.

Today's electricity grid faces significant strain from unprecedented demand growth. Projected demand growth is "higher than at any point in the past two decades." North American Electric Reliability Corp., 2024 Long-Term Reliability Assessment (Dec. 2024), at 8. Main drivers include large commercial and industrial loads, data centers (including those serving artificial intelligence and crypto), and adoption of electric vehicles and heat pumps. These challenges have escalated rapidly:

compared to one year ago, peak demand estimates over the 10-year period have increased by more than 60%. *Id.* at 9.

Renewable power is key to meeting demand. Of new generation coming online, solar photovoltaic is the "overwhelmingly predominant generation type ... followed by battery and hybrid resources, natural-gas-fired generators, and wind turbines." *Id.* at 8. Renewable resources provide increased capacity and essential reliability services as to voltage, frequency, ramping and dispatchability. *Id.* at 10. That's particularly true when intermittent resources (such as solar) are co-located with energy storage, as this allows facilities to provide electricity to the grid at high-demand times, even when the sun is not shining.

FERC's longstanding interpretation of PURPA helps to address the reliability and cost challenges of high electricity demand. PURPA was passed in the wake of the 1973 energy crisis to encourage alternative energy generation and "reduce reliance on fossil fuels." *Portland Gen. Elec. Co. v. FERC*, 854 F.3d 692, 694–95 (D.C. Cir. 2017) (citation omitted). Section 210 directs FERC to "encourage ... small power production" including requiring utilities to purchase power from "small power production facilities." 16 U.S.C. § 824a-3(a), (1). Section 201

defines these as facilities that have "a power production capacity which ... is not greater than 80 megawatts." *Id.* § 796(17)(A).

FERC adopted the "best reading" of this provision in 1981 and stood by it for four decades. The Commission determined that "power production capacity" meant the whole facility's "maximum net output" or "send out" capacity. *Occidental Geothermal, Inc.*, 17 FERC ¶ 61,231 (1981). While the Commission in this proceeding temporarily announced a different view, *Broadview Solar LLC*, 172 FERC ¶ 61,194 (2020), on rehearing just seven months later, FERC affirmed its longstanding understanding. *Broadview Solar LLC*, 174 FERC ¶ 61,199 (2021).

This "best" reading of the statute has the practical effect of bolstering grid reliability at low system cost, consistent with Congressional intent. Larger solar facilities can more frequently provide up to 80 megawatts ("MW") even on suboptimal, cloudy days—megawatts that are sorely needed by ratepayers. Such facilities will never have more than an 80 MW "power production capacity" as long as the inverter, which converts DC to alternating current ("AC") power, has the capacity to produce only 80 MW to the grid. This reading also supports reliability by allowing deployment of energy storage, which enables solar facilities

to charge their batteries during sunlight hours and produce power to the grid in the evenings or early morning when demand is higher. Such facilities have the capacity to produce "not greater than 80 megawatts," but that power is more consistently available and supports reliability. FERC's interpretation aligns with the practicalities of how solar arrays produce usable power to the grid.

Further, this interpretation supports the lowest system cost because it allows renewable energy to replace power from more expensive, less efficient fossil generators and decreases the need to build (and operate) new gas plants. If the Utilities' prevail, many customers could pay higher utility bills for energy from less efficient, high-cost fossil generators. This would also be contrary to PURPA's definition of integrated resource planning, which requires utilities to "provide adequate and reliable service to its electric customers at the lowest system cost." 26 U.S.C. § 2602(19). The Utilities' reading, which sums the rated "capacit[ies]" of individual components regardless of overall facility output, would artificially limit the amount of clean power available to meet demand, departing from PURPA's text and purpose.

## II. Text, structure, and longstanding practice make clear that "power production capacity" means the power production capable of being sent out to the grid.

### A. The tools of statutory interpretation make clear that this is the "best reading" of the provision.

"[E]very statute's meaning is fixed at the time of enactment." *Loper Bright*, 603 U.S. at 400 (citation omitted). "When interpreting statutes, courts take note of terms that carry technical meanings." *Van Buren v. United States*, 593 U.S. 374, 388 (2021) (cleaned up). In 1968, Black's Law Dictionary noted that "capacity" "ha[s] many meanings, dependent on its relationship to the subject-matter" and that one meaning in the energy context was "*actual production* of an oil well." *Black's Law Dictionary* 261 (4th ed. 1968) (emphasis added). Other dictionaries explicitly stated that the "capacity" in the electricity context meant power that could be produced to the grid. *See Webster's New Twentieth Century Dictionary* 267 (2d. ed. 1978) ("capacity" is "the total maximum power which a generator can deliver"); *American Heritage Dictionary* 199 (1969) ("capacity" is "[a] measure of the electric *output* of a generator" (emphasis added)). The Utilities are thus mistaken that this definition is

"profoundly ahistorical."[3]  Utilities Br. 12; *see* FERC Supp. Br. at 11–12 (citing cases).

Both FERC and the Supreme Court understood "capacity" the same way.  *See* 45 Fed. Reg. 12,214, 12,216 (Feb. 25, 1980) (FERC's statement that "[c]apacity costs are the costs associated with providing *the capability to deliver energy*" (emphasis added)); *Mississippi*, 456 U.S. at 747 n.5 (noting that "[a] utility must have enough generating capacity to meet [] demand").  Capacity meant the "power" that the facility is "capable" of producing to the grid.

Further, as this Court previously noted, there is a structural logic in aligning the "power production capacity" threshold with the obligation to purchase "energy and capacity" under PURPA.  *See S. Cal. Edison Co. v. FERC*, 443 F.3d 94, 96 (D.C. Cir. 2006) (approving FERC's method of certifying qualifying facility output as consistent with PURPA because it measures "output that the [facility] actually contributes to the system").  This arrangement is a feature, not a bug: the correct interpretation of

---

[3] The related, longstanding term "capacity factor" is also measured in AC power produced to the grid.

"capacity" allows facilities to more consistently produce the maximum amount of renewable energy allowed under the statute to meet load.

**B.    This reading is bolstered by the consistency of FERC's approach over four decades.**

Even if it were not settled by the text alone, FERC's consistent interpretation of Section 201(17)(A) over forty years "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance[.]"  *Loper Bright*, 603 U.S. at 394 (quoting *Skidmore*, 343 U.S. at 140).  That interpretation plainly "rests on factual premises within [FERC's] expertise."  *Id.* at 374.   The Commission developed its current interpretation just three years after the statute was passed and has remained consistent for 98% of the forty-four years since. *See supra* 6; FERC Supp. Br. at 21–25.

**C.    This "best reading" aligns with how grid operators and regulators understand "power production capacity."**

The "best reading" also aligns with definitions employed by grid operators, which must meet load and keep the lights on.  That's why "[a] resource seeking to participate as a capacity resource in PJM must proceed through the interconnection process and obtain [Capacity Interconnection Rights]," which reflect the capacity of AC power a resource can deliver in light of interconnection and transmission

constraints. *PJM Interconnection, L.L.C.*, 187 FERC ¶ 61,208 (2024); *accord* FERC Supp. Br. at 10.

Legislatures and public utility commissions also understand "capacity" in this way. Under Florida law, "gross capacity" means "the capacity measured as alternating current which is independently metered prior to the point of interconnection to the transmission grid." Fla. Stat. Ann. §§ 403.506(1), 403.503(17). Arkansas likewise sets "generating capacity" limits for net-metering facilities based on AC power. *See* Ark. Code Ann. § 23-18-603(9)(B)(i), (ii)(a). And the South Carolina Public Service Commission recently affirmed that the definition "electric generating plant and associated facilities designed for, or capable of, operation at a capacity" refers to AC capacity that can be produced to the grid. S.C. Pub. Serv. Comm'n, *Order Addressing the Seventy-Five Megawatt Capacity Threshold Requirement*, Nos. 2023-38-E, 2023-39-E, 2023 WL 9107270, at *74–75 (Dec. 28, 2023) (citing S.C. Code. Ann. 58-33-20(2)(A)). The Commission noted that this was the

"operating assumption of all parties in South Carolina" since 1971. *Id.* at 73.[4]

This Court has already done the work required by *Loper Bright*. FERC's interpretation of "power production capacity" is the "best reading" in light of the statute's text, structure, and purpose.

## III. If FERC's longstanding construction of Section 796(17)(A) is rejected, which it should not be, the remedy should be limited to minimize disruption.

The grid faces significant reliability challenges meeting rapidly escalating load growth. If this Court disagrees and grants the petition, which is unwarranted, the ruling should have only prospective effect and not apply to facilities that have already been certified as qualifying "small power production facilities." Retroactive application of the Utilities' novel interpretation would disrupt existing low-cost generation and upend industry stability.

Where parties have relied on a prior interpretation for decades in making long-term investments, a new interpretation should not have retroactive application. In light of constitutional concerns, including

---

[4] This has also long been the "operating assumption" of the Utilities. *See* FERC Supp. Br. 13 (collecting instances when NorthWestern used "capacity" consistent with its settled industry meaning).

under the Due Process Clause, "the regulatory interest that supports prospective application will not necessarily also sustain its application to past events." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268 n.21 (1994). "[F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* at 270. Courts "routinely apply *Landgraf*'s well-worn retroactivity principles to all sorts of agency actions — including FERC's." *PJM Power Providers Grp. v. FERC*, 96 F.4th 390, 398-99 (3d Cir. 2024) (cleaned up); *see also Conn. Valley. Elec. Co. v. FERC*, 208 F.3d 1037, 1044 (D.C. Cir. 2000) (finding "no legal principle that would require the Commission ... to apply retroactively" a more restrictive definition of PURPA qualifying facilities).

Hundreds of entities in the power sector have reasonably relied on the statutory text, the long-settled industry meaning of power "capacity," and forty years of FERC precedent to certify qualified facilities. These facilities have contracted with utilities to provide their output to the grid, and are valuable existing assets for meeting customer demand and ensuring grid reliability at low cost. If the Court grants the petition, it should make clear that an already-qualified facility can lose certification only "for 'events' that occur in the future: recertifications that take place

after [its decision], and only if the facility undergoes a substantive change" that increases its power production capacity. *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 982 (9th Cir. 2023).

## CONCLUSION

The Court should deny the petitions for review.

Dated: February 3, 2025

Respectfully submitted,

John D. Burns
General Counsel
CAROLINAS CLEAN ENERGY
BUSINESS ASSOCIATION
811 Ninth Street Ste. 120-158
Durham, NC 27705
919-306-6906
counsel@carolinasceba.com

*Counsel for Amicus Curiae*
*Carolinas Clean Energy Business*
*Association*

*/s/ Kevin Poloncarz*
Kevin Poloncarz
Jayni Hein
Timothy Duncheon
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, 54th Floor
San Francisco, CA 94105-2533
(415) 591-7070
kpoloncarz@cov.com
jhein@cov.com
tduncheon@cov.com

*Counsel for Amicus Curiae Solar*
*Energy Industries Association*

Irion A. Sanger
SANGER LAW, PC
4031 SE Hawthorne Blvd.
Portland, OR 97214
(503) 756-7533
irion@sanger-law.com

*Counsel for Amicus Curiae*
*Community Renewable*
*Energy Association*

Whit Cox
Regulatory Director
SOUTHERN RENEWABLE ENERGY
ASSOCIATION
11610 Pleasant Ridge Road, Suite
103 # 176
Little Rock, AR 72223
(501) 701-0874
whit@southernrenewable.org

*Counsel for Amicus Curiae Southern*
*Renewable Energy Association*

Alyssa Forest
Policy and Regulatory Affairs
Director
OREGON SOLAR + STORAGE
INDUSTRIES ASSOCIATION
PO Box 14927
Portland, OR 97293
(916) 960-8884
alyssa@orssia.org

*Counsel for Amicus Curiae Oregon
Solar + Storage Industries
Association*

# CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's November 20, 2024 Order, because it contains 2,448 words.

This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Century 14-point font.

Dated:  February 3, 2025          */s/ Kevin Poloncarz*
Kevin Poloncarz

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated:  February 3, 2025          */s/ Kevin Poloncarz*
                                  Kevin Poloncarz