**ORAL ARGUMENT HELD SEPTEMBER 7, 2022**
**OPINION ISSUED FEBRUARY 14, 2023**

No. 21-1136 (consolidated with Nos. 21-1142 and 21-1149)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

EDISON ELECTRIC INSTITUTE,
NORTHWESTERN CORPORATION d/b/a NORTHWESTERN ENERGY,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

BROADVIEW SOLAR, LLC; NEWSUN ENERGY LLC;

*Respondent-Intervenors*.

─────────────────────────

On Remand from the United States Supreme Court

On Petitions for Review of Orders of the Federal Energy Regulatory Commission — 174 FERC ¶ 61,199 (March 19, 2021); 175 FERC ¶ 62,100 (May 17, 2021); 175 FERC ¶ 61,228 (June 17, 2021)

─────────────────────────

**JOINT SUPPLEMENTAL REPLY BRIEF OF PETITIONERS THE EDISON ELECTRIC INSTITUTE AND NORTHWESTERN CORPORATION D/B/A NORTHWESTERN ENERGY**

─────────────────────────

(Names and addresses of counsel appear inside cover.)

| | |
|---|---|
| Sarah N. Norcott<br>NORTHWESTERN CORPORATION<br>    D/B/A NORTHWESTERN ENERGY<br>208 North Montana Avenue<br>Suite 200<br>Helena, MT 59601<br>Phone: 406.443.8996<br>Email: sarah.norcott@northwestern.com<br><br>*Counsel for Petitioner NorthWestern*<br>*Corporation d/b/a NorthWestern Energy* | Jeremy C. Marwell<br>James T. Dawson<br>VINSON & ELKINS LLP<br>2200 Pennsylvania Avenue, NW<br>Suite 500 West<br>Washington, DC 20037<br>Phone: 202.639.6507<br>Email: jmarwell@velaw.com<br>Email: jamesdawson@velaw.com<br><br>*Counsel for Petitioner*<br>*the Edison Electric Institute* |

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................. i
Table of Authorities ............................................................................................ ii
Glossary .............................................................................................................. iii
Argument in Reply ..............................................................................................1
    I.    Petitioners' Reading of PURPA Is the "Best" Interpretation......................1
    II.   FERC's Interpretation Does Not Warrant Any Special Weight Under *Skidmore*. ..................................................................................8
Conclusion .........................................................................................................11
Certificate of Compliance .................................................................................12
Certificate of Service ........................................................................................13

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*A.T. Massey Coal Co. v. Holland*,
  472 F.3d 148 (4th Cir. 2006) ...............................................................................10

*B.D. v. District of Columbia*,
  817 F.3d 792 (D.C. Cir. 2016) ...............................................................................8

*Energy Rsch. Found. v. Def. Nuclear Facilities Safety Bd.*,
  917 F.2d 581 (D.C. Cir. 1990) ...............................................................................7

*K.D. v. Downingtown Area Sch. Dist.*,
  904 F.3d 248 (3d Cir. 2018) ...................................................................................9

*Office of Consumers' Counsel v. FERC*,
  655 F.2d 1132 (D.C. Cir. 1980) .............................................................................9

*Pacific Gas & Elec. Co. v. FERC*,
  113 F.4th 943 (D.C. Cir. 2024) ..............................................................................9

*Solar Energy Indus. Ass'n v. FERC*,
  59 F.4th 1287 (D.C. Cir. 2023) ..................................................................... 10, 11

**Statutes:**

16 U.S.C. § 824a-3(b) ...............................................................................................8

26 U.S.C. § 48E(a)(2) ...............................................................................................7

# GLOSSARY

As used herein,

**AC** refers to alternating current power;

**Broadview Supp. Br.** refers to the supplemental brief of Broadview Solar, LLC and New Sun Energy LLC (Doc. 2096816), filed on January 27, 2025;

**DC** refers to direct current power;

**ENGO *Amicus* Br.** refers to the brief of environmental organizations as *amici curiae* (Doc. 2098335), filed on February 3, 2025;

**FERC** or the **Commission** refer to the Federal Energy Regulatory Commission;

**FERC Br.** refers to FERC's response brief in this appeal (Doc. 1942851), filed in final form on April 12, 2022;

**FERC Supp. Br.** refers to FERC's supplemental brief in this appeal (Doc. 2094404), filed on January 15, 2025;

**Gallatin *Amicus* Br.** refers to the brief of Gallatin Power Partners, LLC as *amicus curiae* (Doc. 2098490), filed on February 3, 2025;

**JA** refers to the joint appendix filed in this case on April 7, 2022 (Doc. 1942284);

**Opening Br.** refers to Petitioners' opening brief in this appeal (Doc. 1942845), filed in final form on April 12, 2022;

**Opening Supp. Br.** refers to Petitioners' supplemental brief in this appeal (Doc. 2089204), filed on December 11, 2024;

**PURPA** refers to the Public Utility Regulatory Policies Act of 1978; and

**SEIA *Amicus* Br.** refers to the corrected brief of renewable energy associations as *amici curiae* (Doc. 2098485), filed on February 3, 2025.

Respondents' supplemental briefs retread old ground and fail to grapple with the sea change worked by *Loper Bright*. The petitions for review should be granted.

## ARGUMENT IN REPLY

**I.    Petitioners' Reading of PURPA Is the "Best" Interpretation.**

1. **"Facility."**  Respondents' extended discussions of the word "facility" continue to miss the key point. All agree that "facility" means the whole facility. *See* Opening Supp. Br. 18; *but cf.* FERC Supp. Br. 6 (arguing incorrectly that Petitioners disagree with dissent's view of "facility"). The key question is whether "power production capacity" means the amount of power the whole facility can create (as Petitioners contend), or the amount of power the whole facility can deliver (as FERC contends).

Respondents fault Petitioners for supposedly focusing on just the solar array, not the "whole facility." FERC Supp. Br. 6, 25; Broadview Supp. Br. 17. As noted above, that misstates Petitioners' position. But more generally, if "production" means "generation," the natural way to measure the whole facility's production capacity is to sum the generation capabilities of those components involved in generation.

Petitioners have focused on the solar array because it is the component that creates power. That does not mean Petitioners' approach requires looking only to a single component. Consider a facility that consists of five 100-megawatt generators

1

behind a single 80-megawatt inverter. Petitioners' reading of "power production capacity" would account for the power production capabilities of all five generators. FERC, by contrast, would say that facility's power production capacity is only 80 megawatts, based on the inverter's conversion capacity—effectively accounting for just one component. *See* FERC Supp. Br. 8 ("The power production capacity of the Broadview Facility taken as a whole is—<u>due to the inverters</u>—a maximum [of] 80 megawatts." (emphasis added)).

FERC's focus on the inverters is particularly odd given that inverters do not <u>make</u> power, but rather convert it from DC to AC. Indeed, as Broadview itself admits, the inverters matter not because they <u>make</u> power but because they enable already-made power to be "delivered." Broadview Supp. Br. 12. But because the operative question when determining "power production capacity" is how much "power" (AC or DC) the whole facility can <u>make</u>, the size of the inverters is not dispositive. In this sense the inverters are akin to the brackets that hold the solar panels in place—no one doubts that both the brackets and the inverters are important components of the "whole facility," but neither creates power, and thus neither is determinative in computing power production capacity.

**2. "<u>Production</u>."** The consensus among dictionaries contemporaneous with PURPA's enactment is that the word "production" means to create, make, or generate. *See* Opening Br. 23 & nn.10-12. FERC has now issued three orders and

2

filed three appellate briefs, none of which contain a single dictionary definition of "production." FERC criticizes Petitioners for relying on "generic" definitions, rather than supposed "technical" or "specialized" meanings. FERC Supp. Br. 9. But FERC marshals no technical or specialized dictionary that reflects any <u>other</u> definition. And, given that FERC's entire case now rides on the principle that "production" means "delivery," it is telling that neither FERC, nor Broadview, nor any among their fleet of *amici* have ever produced a single dictionary definition that says so. To the contrary, one of the Commission's own *amici* cites an (extra-record) solar power purchase agreement, defining "Maximum <u>Delivery</u> Capacity" as "maximum aggregate <u>output</u>" to the grid, in alternating current. Gallatin *Amicus* Br. 5 (emphasis added). That example proves <u>Petitioners'</u> point: "production capacity" means something different than "delivery capacity."

For its part, Broadview marshals a handful of dictionaries that equate "production" with "output." Broadview Supp. Br. 5. But that is the minority view, *see* Opening Br. 24 n.15, and in any case it does Respondents no good.

Under any defensible accounting method, Broadview's "output" <u>is</u> greater than 80 megawatts, because the whole facility's power "production" process results in up to 80 megawatts of power going to the grid and the rest (up to an additional 50 megawatts at a given time) to a battery. On Broadview's puzzling theory, power that the facility has already generated, but that is being stored in a battery for later

3

delivery, has not been "produced." That is not what ordinary speakers of English would understand "production" to mean. Indeed, even the Commission seems to reject that premise, conceding that Broadview's power production capacity <u>would</u> exceed 80 megawatts if its inverters could convert 130 megawatts from DC to AC power, but 50 megawatts of that power was then (presumably converted back to DC power and) stored in a battery "immediately after leaving the Facility." FERC Supp. Br. 20. Calculating "power production capacity" should not turn on such formalistic distinctions.

Put differently, even if this Court reads "production" and "capacity" as referring to "output," the question would remain: output to whom? FERC and Broadview insist the only relevant output is to the grid. *See* FERC Supp. Br. 16 ("send out"); Broadview Supp. Br. 2 ("net external deliverable power"). But the statute does not say that, nor does it make practical sense. When the solar array is producing more than 80 megawatts, Broadview is generating surplus power beyond what can be immediately delivered. "Broadview does not discharge the surplus electricity into the ground or the air," but rather routes it to the battery. Rehearing Order P 36 (Danly, Comm'r, dissenting), JA226. There is no reason why already-created power routed to a battery instead of the grid should be excluded from a measurement of facility "output."

4

FERC makes multiple analytical missteps in critiquing Judge Walker's dissent. Judge Walker described a situation in which the sun is shining and the solar array is producing 130 megawatts of power, of which 80 megawatts is being sent through the inverters to the grid and 50 megawatts to the battery. As Judge Walker explained, on these facts the facility's "production" is 130 megawatts. FERC suggests that in this scenario, "the battery's contribution has already been credited in the 80-megawatt figure." FERC Supp. Br. 19. But that is wrong. On the facts described above, the 80 megawatts of power flowing through the inverters comes from the solar array, with nothing coming from the battery, so the battery's contribution is <u>not</u> a part of the 80 megawatts. Judge Walker and Petitioners count each stream of power only once; FERC, by contrast, would count <u>zero</u> times the power being generated but delivered to the battery. FERC Supp. Br. 17.

**3. "Capacity."** PURPA-era dictionaries confirm that "capacity," in the context of the phrase "power production capacity," refers to the maximum level of production. Opening Br. 25 & nn.16-18. Capacity and delivered output are different: When, as here, the facility's ability to produce power exceeds its ability to deliver power, then "capacity" exceeds "output."

The centerpiece of FERC's theory is a series of cherry-picked definitions, long postdating PURPA, that equate "capacity" with "output." The original panel opinion declined to consider those definitions because they were absent from the

5

orders on review, and the post-GVR opinion should do the same—notwithstanding FERC's current confusing assertion (Supp. Br. 11 n.1) that its orders did in fact rely on an "industry-specific definition" of capacity, despite having never cited one. One of FERC's *amici* reasons that, after *Loper Bright*, the Court is free to consider any argument in ascertaining the meaning of a statute. Gallatin *Amicus* Br. 13-14. But *Loper Bright* did not overrule (or even mention) the *Chenery* doctrine, which remains binding as expressed in Supreme Court and prior panel precedents; nor did *Loper Bright* disrupt the normal rules of issue preservation or appellate litigation. FERC's current insistence that its interpretation reflects an exercise of its "specialized experience" and "expertise," FERC Supp. Br. 24, undercuts suggestions that *Chenery* does not apply.

In any case, FERC's theory that "capacity" means "maximum output" does the agency no good. *See* FERC Supp. Br. 10; Broadview Supp. Br. 5. The statute does not use the word "capacity" in isolation, but rather refers to "production capacity."[1] Here, the facility's maximum output—*i.e.*, the amount of power that all

---

[1] The same rationale distinguishes cases using the standalone term "capacity" in different contexts. FERC Supp. Br. 11-12; Broadview Supp. Br. 6, 8-9. FERC and Broadview invoke various materials supposedly showing how Petitioner NorthWestern Corporation uses the word "capacity" in different contexts. FERC Supp. Br. 13; Broadview Supp. Br. 7-8. That a regulated entity would use different phrases ("nameplate capacity") in distinct ways in filings to state regulators, made in the shadow of FERC's orders here (which remain in effect), is both unsurprising and not controlling of PURPA's meaning. In any event, the usage is hardly conclusive. *E.g.*, Broadview Br. 7 (use of phrase "nameplate capacity" to mean

6

the components of the facility can <u>create</u>, working together—far exceeds 80 megawatts. That Broadview can only <u>deliver</u> 80 megawatts to the grid in the form of AC power at any one time is irrelevant; that is the measure of the facility's <u>delivery</u> capacity, not its <u>production</u> capacity. *See* Rehearing Order P 13 & n.22 (Danly, Comm'r, dissenting), JA218.

  **4. Statutory context.** If Congress meant the size of qualifying facilities to be measured by "delivery capacity" or "AC output," it would have said so. Congress understands how to convey those concepts, because it used like words elsewhere in PURPA and in other relevant statutes, but not here. *See* Opening Supp. Br. 13-14. FERC has no answer, except to suggest that 26 U.S.C. § 48E(a)(2)'s explicit reference to "output . . . as measured in alternating current" supposedly "makes explicit" a background norm that "power production capacity" means "AC output." FERC Supp. Br. 14. FERC draws precisely the wrong textual inference. That Congress used "AC output" in one statute and "power production capacity" in another suggests that those phrases mean <u>different</u> things, not the same. *See Energy Rsch. Found. v. Def. Nuclear Facilities Safety Bd.*, 917 F.2d 581, 583 (D.C. Cir. 1990) ("[W]hen Congress . . . employs different words, it usually means different things." (internal quotation marks omitted)).

---

output of "inverters <u>or</u> generating units" (emphasis added)); FERC Supp. Br. 13 (measuring project size based on inverter output).

7

**5. <u>Policy arguments.</u>** The Court should disregard the various policy and other arguments advanced only by *amici*. *See B.D. v. District of Columbia*, 817 F.3d 792, 800 (D.C. Cir. 2016). Anyway, those arguments fail. PURPA entitles qualifying facilities to be paid up to the utility's avoided cost, 16 U.S.C. § 824a-3(b), undercutting suggestions that power from facilities like Broadview will necessarily be cheaper than what the utility would otherwise pay. *See* Gallatin *Amicus* Br. 6-7, 11-12; SEIA *Amicus* Br. 7. No party briefed any limitation on remedy, *see* SEIA *Amicus* Br. 12-14, which raises complex issues under FERC's regulations governing qualifying facility certifications; in any event, this Court's decision should clearly apply to orders currently on appeal.

**II. FERC's Interpretation Does Not Warrant Any Special Weight Under *Skidmore*.**

Rather than attempting to position this case within footnotes 5 and 6 of *Loper Bright*, FERC instead contends that its interpretation "checks all [the] boxes" necessary to receive "respect" under *Skidmore*. FERC Supp. Br. 22. But in truth FERC's interpretation checks <u>none</u> of those boxes.

**1. <u>Specialized expertise and experience.</u>** FERC's late-arriving contention that its interpretation is "rooted in its specialized experience," FERC Supp. Br. 24, is contradicted by its prior argument to this Court that its position "turns on . . . principles of statutory interpretation" that are "<u>not</u> . . . specifically entrusted to [the] agency's expertise," FERC Br. 40 n.9 (emphasis added; cleaned up). FERC's own

8

*amici* portray this case as involving a straight issue of statutory interpretation and assert that the agency has no "discretion" on "what [the] statutory requirement means." Gallatin *Amicus* Br. 13; *see Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1141 & n.21 (D.C. Cir. 1980) (*Skidmore* respect to FERC warranted on ratemaking and public-interest determinations, but unwarranted as to "legal issue[s] not implicating any expertise or specialized judgment").

    **2. Longstanding interpretation.** FERC next insists that *Skidmore* respect is appropriate because its orders track its 1981 *Occidental* decision. Wrong.

    Under this Court's post-*Loper Bright* case law, an agency is due no respect when it "relie[s] on" prior orders that themselves were "not based on the statutory text." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 950 (D.C. Cir. 2024); *see K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255-56 (3d Cir. 2018) (no *Skidmore* weight where agency document failed to "address the [statute's] language, let alone parse it"). *Occidental* fits that description precisely: The order is two pages long and contains no textual analysis. Petitioners discussed that problem (Opening Supp. Br. at 14 & n.4); FERC, Broadview, and their *amici* ignore it.

    In any event, the question addressed by *Occidental* and its progeny (whether power lost to on-site auxiliary uses can be subtracted out when calculating "power production capacity") is fundamentally different from the question here (involving power that is <u>not</u> lost on site, but rather stored for later delivery). *See* Opening Br.

9

30-31; *Solar Energy Indus. Ass'n v. FERC*, 59 F.4th 1287, 1301 (D.C. Cir. 2023) (Walker, J., dissenting). All agree that this case presented the "first occasion" for FERC to consider the latter issue (Rehearing Order P 20, JA199), which forecloses FERC's assertion that it has extensive "experience" with the question presented. *See A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 169 (4th Cir. 2006) (no *Skidmore* where agency "developed virtually no experience" on the question). What FERC and its *amici* are really requesting is for this Court to credit the Commission's decision to <u>extend</u> the atextual *Occidental* test to a separate legal question that no one foresaw or considered in 1981. *Cf.* ENGO *Amicus* Br. 6-8. Invoking *Skidmore* to shield <u>that</u> decision from searching, independent judicial review would cut the legs out from *Loper Bright*.

    **3. Thorough explanation.** The reasoning behind FERC's interpretation of PURPA has been anything but "thorough." To review, the building blocks for FERC's current argument are (1) a definition of "capacity" that FERC previously told this Court was being "asserted on appeal notwithstanding its absence from the Commission's orders on review," FERC Br. 40 & n.9; (2) a theory concerning the supposed talismanic significance of "AC power" that appears in just a fragment of one footnote in one of FERC's orders, *see* Opening Supp. Br. 16 n.5; and (3) heavy reliance on *Occidental*, FERC Supp. Br. 25, an order that <u>FERC itself</u> previously described as off-point factually and inconsistent with PURPA's text, Initial Order P

10

23, JA122-23. And the agency's latest brief continues its pattern of flip-flopping. FERC's orders stated that the primary textual justification for its position was that "'production' and 'delivery'" are "overlapping terms," Rehearing Order P 25, JA201; when pressed at argument, FERC abandoned that (demonstrably incorrect) theory, *Solar Energy*, 59 F.4th at 1300 & n.4 (Walker, J., dissenting); but now FERC again argues that "production and delivery are overlapping," FERC Supp. Br. 14 (cleaned up). These shifting sands represent neither consistent nor "thorough" reasoning.

## CONCLUSION

This Court should grant the petitions for review.

Date: February 28, 2025                                                   Respectfully submitted,

*/s/ Sarah N. Norcott*                                                          */s/ Jeremy C. Marwell*
   (by permission)

Sarah N. Norcott                                                                  Jeremy C. Marwell
NORTHWESTERN CORPORATION                                        James T. Dawson
   D/B/A NORTHWESTERN ENERGY                                   VINSON & ELKINS LLP
208 North Montana Avenue                                             2200 Pennsylvania Avenue, NW
Suite 200                                                                              Suite 500 West
Helena, MT 59601                                                              Washington, DC 20037
Phone: 406.443.8996                                                         Phone: 202.639.6507
Email: sarah.norcott@northwestern.com                        Email: jmarwell@velaw.com
                                                                                           Email: jamesdawson@velaw.com

*Counsel for Petitioner NorthWestern*                          *Counsel for Petitioner*
*Corporation d/b/a NorthWestern Energy*                 *the Edison Electric Institute*

11

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the word limit set in this Court's order of November 20, 2024 because it contains 2,499 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and 27(d)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

February 28, 2025

/s/ *Jeremy C. Marwell*
Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for Petitioner*
*the Edison Electric Institute*

# CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on February 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

February 28, 2025
*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for Petitioner
the Edison Electric Institute*