# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Filed September 9, 2025

No. 21-1126

SOLAR ENERGY INDUSTRIES ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEWSUN ENERGY LLC AND BROADVIEW SOLAR, LLC,
INTERVENORS

———

Consolidated with 21-1136, 21-1142, 21-1149, 21-1175

———

On Remand from the Supreme Court of the United States

———

*Jeremy C. Marwell* argued the cause for petitioners The Edison Electric Institute and Northwestern Corporation. With him on the briefs were *Sarah N. Norcott* and *James T. Dawson*.

*Heather Curlee* argued the cause for petitioner Solar Energy Industries Association. With her on the briefs was *Todd G. Glass*.

2

*Adam Lowney* and *Christopher Jones* were on the brief for *amicus curiae* PacifiCorp, d/b/a/ Pacific Power and Rocky Mountain Power, in support of petitioners.

*Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen,* General Counsel, at the time the brief was filed, and *Robert H. Solomon*, Solicitor. *Anand Viswanathan*, Attorney, entered an appearance.

*Robert M. Loeb* argued the cause for intervenors NewSun Energy LLC and Broadview Solar, LLC. With him on the brief were *Gregory M. Adams*, *Adam Wenner,* and *Jeremy R. Peterman. Peter Richardson* entered an appearance.

*Kip D. Nelson*, *Nick Jimenez*, and *Irion A. Sanger* were on the brief for *amici curiae* Carolinas Clean Energy Business Association, et al. in support of respondent.

Before: PILLARD, KATSAS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WALKER.

PILLARD, *Circuit Judge*:    In 2023, we applied *Chevron* to deny Petitioners' challenge to the Federal Energy Regulatory Commission's order certifying the Broadview solar power facility in Montana as a "small power production facility" under the Public Utility Regulatory Policies Act of 1978. Petitioners, a utility that would be obligated to buy Broadview's power if it is correctly certified together with a trade association representing electric utilities nationwide, sought Supreme Court review. The Court granted their petition

3

for *certiorari*, vacated our judgment, and remanded to us for further consideration in light of *Loper Bright v. Raimondo*. *Edison Elec. Inst. v. FERC*, 144 S. Ct. 2705 (2024).

The nub of the dispute is whether the Broadview facility's maximum "power production capacity" exceeds the Public Utility Act's 80 megawatt (MW) ceiling. Broadview has a solar array capable of generating up to 160 MW and a battery capable of storing up to 50 MW, both as DC (direct current) power. None of that power can be delivered to the electrical grid, however, until it is converted into AC (alternating current) by the facility's inverters. Those inverters have a total net capacity to send out 80 MW of AC power to the grid—whether from the solar array, the battery or some combination thereof.

FERC thought the Public Utility Act's definition of "small facility" was ambiguous because the statute "neither defines the terms 'facility' and 'power production capacity,' nor explains how the Commission is supposed to ascertain the 'power production capacity' of any particular 'facility.'" *Broadview Solar, LLC*, 174 FERC ¶ 61,199, 61,796 (2021). Petitioners assert that "power production capacity" unambiguously means the total amount of DC power generated by the solar array. For its part, FERC has consistently interpreted "power production capacity" to mean the "maximum output that the facility can produce for the electric [grid]." *Id.* at 61,797. When the case was first before us, FERC defended its interpretation as reasonable and within its expertise, and we affirmed under *Chevron*.

On remand from the Supreme Court, we apply the statute without deference under *Loper Bright* and conclude that the maximum "power production capacity" of the "facility" is best read to refer to the amount of AC power that the facility can send out to the grid. That reading accounts for all the facility's

4

components working together, not just the maximum capacity of one subcomponent, and it appropriately focuses on grid-usable AC power. Because the Broadview inverters' maximum output capacity at any given time is 80 MW of AC power, the entire facility's send-out capacity is capped at that level consistent with FERC's decision to certify it as a small power production facility. Because the best view of the statute supports FERC's certification order, we deny the petitions for review.

## I.

### A.

Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA) as part of a package of legislative proposals to combat the nationwide energy crisis of the late 1970s. *FERC v. Mississippi*, 456 U.S. 742, 745 (1982). Title II of PURPA aims to reduce the country's dependence on fossil fuels by encouraging their conservation and the more efficient use of alternative sources of energy generation. *Id.* at 750-51. It does so by recognizing the importance of "small power production facilities" and empowering the Federal Energy Regulatory Commission (FERC or Commission) to subject those "nontraditional" facilities to requirements, regulations, and oversight distinct from those governing traditional power generation facilities. *See* 16 U.S.C. § 824a-3(e), 2601; *Mississippi*, 456 U.S. at 746, 750-51. To qualify under PURPA, a facility must satisfy certain size, location, and energy resource requirements, as follows:

> "[S]mall power production facility" means a facility which is an eligible solar, wind, waste, or geothermal facility, or a facility which—

5

(i)  produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof; and

(ii) has a power production capacity which, together with any other facilities located at the same site (as determined by the Commission), is not greater than 80 megawatts[.]

16 U.S.C. § 796(17)(A).

Congress believed that, by increasing use of small power production facilities that produce power from biomass, waste, renewable, or geothermal resources, it could "reduce the demand for traditional fossil fuels." *Mississippi,* 456 U.S. at 750.  To ensure a market for nontraditional facilities, PURPA directed FERC to require utilities to sell power to and buy power from qualifying facilities at favorable rates.  *See* 16 U.S.C. § 824a-3(a)-(d); 18 C.F.R. § 292.303(a).  Facilities may certify themselves (subject to protest and FERC review) as meeting the regulatory requirements making them eligible for treatment as small power production facilities, or they may apply for certification from the Commission.  *See* 18 C.F.R. § 292.207(a)-(b).

**B.**

Broadview is developing a solar facility in Montana comprised of a solar panel array, which produces up to 160 MW of DC power, and an accompanying battery storage system that can store power from the solar panels during peak sunshine and discharge up to 50 MW of DC power for up to four hours when the sun is not shining.  Because the nation's electrical grid runs on AC power, solar facilities must also have devices known as inverters to convert DC power to grid-usable

6

AC power.  The Broadview facility's inverters have a total net capacity of 80 MW of AC power, making it physically incapable of producing more than 80 MW of electricity for sale to the interconnected utility at any point in time.

The Broadview facility will interconnect with NorthWestern Energy's transmission system.  If Broadview does qualify as a small power production facility, NorthWestern will be required by PURPA to purchase the electricity that it generates.  NorthWestern and Edison Electric Institute, a trade association representing investor-owned electric companies across the United States subject to PURPA's mandatory purchasing obligation, filed motions to intervene in the Broadview docket objecting to certification of the facility.

In a September 2020 Order, the Commission denied Broadview's application for certification, concluding that the facility exceeded the 80 MW statutory limit for "power production capacity."  *See Broadview Solar, LLC*, 172 FERC ¶ 61,194 (2020), *set aside*, 174 FERC ¶ 61,199 (2021), *modified*, 175 FERC ¶ 61,228 (2021).  The key finding was that the relevant capacity was that of the solar array—160 MW.  *Id.* at 62,276.  The Commission acknowledged that it thereby departed from its own precedent defining "power production capacity" in relation to a facility's "send out," or maximum net output of electricity, *Occidental Geothermal, Inc.*, 17 FERC ¶ 61,231 (1981), which in this case all agreed was 80 MW.  But the Commission determined the statute was not intended to encompass "a facility purposefully designed with a 160 MW solar array."  172 FERC ¶ 61,194, at 62,275.

Broadview sought rehearing.  In March 2021, the Commission reversed course and granted Broadview qualifying facility status under PURPA.  174 FERC ¶ 61,199

7

(2021). The Commission set aside its initial order and reinstated *Occidental*'s "send out" approach based on its conclusion that the best reading of the statute considers all the facility's subcomponents working together, not the solar array in isolation. *Id.* at 61,797. Solar Energy Industries Association (SEIA), a trade association representing solar companies, filed an untimely motion to intervene on rehearing, which FERC denied for want of the requisite showing of good cause for its late filing. *Id.* at 61,795.

NorthWestern and Edison then sought rehearing of the order recognizing Broadview as a small power production facility, and FERC issued another order affirming that Broadview qualifies. Noting that "[b]oth Broadview's solar [photovoltaic] array and its battery system operate in DC power and both are upstream of a single pathway through the DC-to-AC inverters to the interconnection," the Commission rejected the contention that the battery's capacity had to be calculated separately from the capacity of the solar array and added to it to determine whether the facility's "power production capacity" is "not greater than 80 megawatts." 175 FERC ¶ 61,228, 62,314, 62,320 (2021).

The Commission disagreed with Edison's contention that Broadview was designed to "game" PURPA's power production capacity limit. FERC instead emphasized that the battery enhances Broadview's capacity factor. *Id.* at 62,318-62,319. A capacity factor reflects how consistently over time a power plant achieves its maximum power output. *See* "Capacity Factor," U.S. Energy Info. Admin., https://perma.cc/Y75V-QF96 (last visited July 2, 2025); "What is Generation Capacity?," U.S. Dep't of Energy (March 30, 2025), https://perma.cc/MF7Y-Z3AD. The capacity factor of a typical solar facility is lower than that of other types of PURPA-qualifying facilities, "like those using biomass or

8

waste," whose "fuel can more consistently deliver 80 MW of AC electricity to their points of interconnection in all hours." *Broadview Solar*, 175 FERC ¶ 61,228, at 62,318-62,319. But, with the help of its battery, Broadview can achieve its maximum 80 MW output approximately 35 to 40 percent of the time—a substantial improvement over a solar facility without battery storage, which achieves its maximum only 25 to 30 percent of the time. *See id.* FERC concluded that Broadview's design "does not reflect non-compliance with PURPA," but instead the permissible use of technology to boost its capacity factor "while remaining an eligible qualifying facility under PURPA" with production never in excess of 80 MW. *Id.* at 62,319.

This court denied the petitions for review, concluding that the Commission's interpretation of the "power production capacity" of a "facility" was reasonable and therefore entitled to deference under *Chevron*. *Solar Energy Indus. Ass'n v. FERC*, 59 F.4th 1287 (D.C. Cir. 2023). It also rejected Petitioners' arguments that the Commission acted arbitrarily and capriciously in approving Broadview's application. *Id.* at 1294-95. Finally, the panel upheld the Commission's denial of SEIA's untimely motion to intervene and dismissed its petition for review. *Id.* at 1295.

Edison and NorthWestern sought Supreme Court review limited to (1) whether FERC correctly interpreted "power production capacity" and (2) whether its interpretation was entitled to judicial deference under *Chevron*. Petition for Writ of Certiorari, *Edison Elec.*, 144 S. Ct. 2705 (No. 22-1246). After the Court decided *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), it granted the petition in this case and, without deciding the merits, vacated our prior decision and remanded to us for further consideration in light of *Loper Bright*. *Edison Elec.*, 144 S. Ct. 2705. On remand, we apply

9

the Court's directive to "exercise [our] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 412.

## II.

Taking a fresh look at the statutory text and context of 16 U.S.C. § 796(17)(A), we hold that a small power production facility's "power production capacity" refers to its maximum net output of AC power to the electrical grid at any given point in time. Because the amount of power the Broadview facility can send out to the grid is limited by its inverters to 80 MW, it qualifies as a small power production facility under PURPA.

### A.

#### i.

Broadview qualifies under section 796(17)(A) if it is a "facility" with a "power production capacity" no greater than 80 MW. "[W]hen addressing a question of statutory interpretation, we begin with the text," and apply "the traditional tools of statutory construction." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 947-48 (D.C. Cir. 2024) (citations and internal quotation marks omitted). All parties agree that "facility" refers to all components of the Broadview project as they function together—that is, the solar array, the battery, and the inverters. Pet Supp. Br. 18; FERC Supp. Br. 5-6. They dispute only the meaning of "power production capacity."

Invoking definitions of "power," "production," and "capacity" from dictionaries contemporaneous with PURPA's enactment, Petitioners assert the statutory phrase necessarily refers to "the maximum amount of AC or DC power that a facility can create." Pet. Supp. Br. 9-10. They argue that Broadview's power production capacity is 160 MW because

10

the solar array can generate up to that amount of raw DC power. The Commission counters with industry definitions and evidence of its own prior interpretations to define "power production capacity" as the total amount of grid-usable AC power that the facility as a whole can generate. FERC Supp. Br. 8-13.

The Commission has the better reading of the text. Section 796(17)(A) refers to the "power production capacity" of a "facility" which "produces electric energy." Because Congress chose to refer to the "facility" rather than a particular subcomponent like the power generation unit, the best reading is that the "power production capacity" at issue is the capacity of all the components as they work together to produce usable power. The only grid-usable form of electric energy the facility produces is AC power. The most natural reading of "power production capacity" of the facility, then, is the amount of AC power that the overall facility transmits to the electrical grid.

Petitioners' contrary argument that "power production capacity" must refer to the maximum potential output of the solar array is unpersuasive. "[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Reno v. Koray*, 515 U.S. 50, 56 (1995) (internal quotation marks omitted). We cannot ignore the word "facility" to instead consider the capacity of the solar array alone. When reading statutes, "[w]e presume that Congress did not 'include words that have no effect,' and so we generally 'avoid a reading that renders some words altogether redundant.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012)). And, as a practical matter, looking to the solar array by itself makes little sense because it generates DC

11

power, which is not the form in which the electricity is sold. The best reading of "power production capacity" of the facility refers to the amount of grid-usable electricity that it produces, in line with the statutory goal of regulating the relationship between power generators and the utilities they supply.

The statute's history and purpose confirm that interpretation of section 796(17)(A). *See Solar Energy*, 59 F.4th at 1293-94. The House Committee Report accompanying PURPA's enactment stated that "[t]he power production capacity of the facility means the rated capacity of the facility." H.R. Rep. No. 95-1750, at 89 (1978) (Conf. Rep.). That highlights the statute's textual reference to the "power production capacity" of the whole facility and reinforces that it would be error to assess the capacity of the generating unit—the solar array—on its own.

The statutory purpose to prompt development of alternative sources of usable energy also supports that reading. Congress enacted Title II of PURPA "to encourage the development of . . . small power production facilities" and promote the use of alternative energy sources, including solar power. *Conn. Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1045 (D.C. Cir. 2000) (quoting *FERC v. Mississippi*, 456 U.S. at 750); *see* 16 U.S.C. § 824a-3(a). Unlike many other energy sources, a solar array generates power intermittently. It needs sunlight; cloud cover and nighttime darkness limit a solar array's production capability. Broadview partially offset that disadvantage by installing a solar array with a capacity of 160 MW plus a battery. During periods of ample sunshine, the facility can send out 80 MW of AC power while also charging the battery. During some of the periods without sunshine, when the solar array cannot generate power to send through the inverters to the grid, the facility can send out previously generated power stored in the battery. The battery thus allows

12

the facility to spread over more hours of the day the energy the solar panels generate only when the sun shines, enabling the facility to more consistently deliver AC power to the grid.

The battery works to narrow the gap between a solar facility's capacity factor and those of other PURPA-qualifying generation alternatives—such as facilities powered by geothermal, biomass, or waste energy—that can deliver a maximum of 80 MW of electricity consistently throughout a 24-hour period. Even with its battery, however, the Broadview facility cannot continuously deliver 80 MW of AC power, and at no time can it send out more than that statutory maximum, which is keyed to power and not capacity factor. For these reasons, disqualifying Broadview because one of the facility's component parts has a maximum nominal production capacity above 80 MW would be inconsistent with Congress's stated goal of boosting small-scale solar power facilities.

**ii.**

FERC's interpretation of section 796(17)(A) is bolstered by the fact that the Commission has consistently for 44 years defined "power production capacity" as the amount of power that a facility as a whole sends out to the electrical grid. The Commission has calculated a facility's power production capacity using the facility's net output, or "send out," at least since its order in *Occidental Geothermal*, 17 FERC ¶ 61,231 (1981). In *Occidental*, the Commission reasoned that "a facility's power production capacity is not necessarily determined by the nominal rating of even a key component of the facility." *Id.* at 61,445. "For example, while economy dictates that a large facility be built so that all its components have nearly the same operating limits, thus minimizing the costs of unutilized component capabilities, it is not uncommon for smaller facilities to find it most economic to employ

13

commercially available components some of which have individual capabilities significantly exceeding the overall facility capabilities." *Id.* The Commission therefore concluded that "power production capacity" is the "maximum net output of the facility which can be safely and reliably achieved under the most favorable operating conditions likely to occur over a period of several years." *Id.* The net output is the gross amount of electricity generated, minus electricity that never reaches the grid because it is consumed on site for purposes such as auxiliary operating equipment. *See id.* In the simplest terms, the net output equals the amount of electric power that is transmitted from the facility to the grid for customer use—its "send out."

Since it decided *Occidental*, the Commission has consistently used the "send out" approach to calculate power production capacity. For example, in *Malacha Power Project, Inc.*, 41 FERC ¶ 61,350 (1987), the Commission concluded that "the electric power production capacity" of a hydroelectric facility was "the capacity that the electric power production equipment delivers to the point of interconnection with the purchasing electric utility's transmission system." *Id.* at 61,445. *See also Penntech Papers, Inc.*, 48 FERC ¶ 61,120, 61,423 (1989) (rejecting calculation of power production capacity based on gross output in favor of net output approach); *Turner Falls Ltd. P'ship*, 53 FERC ¶ 61,075, 61,225 (1990) (same).

FERC's initial decision in this case repudiated its "send out" approach, *see* 172 FERC ¶ 61,194, only to revert on rehearing to its longstanding reading of the statute, *see* 174 FERC ¶ 61,199; 175 FERC ¶ 61,228. The Commission thus applied the "send out" approach to the Broadview facility, deeming it most logical to "look to the maximum output that the facility can produce for the electric utility after accounting

14

for all the constituent parts that make up the facility, which in this case includes the inverters." 174 FERC ¶ 61,199, at 61,797. For that reason, "power sent from the solar panels to other internal components, rather than to the grid, cannot properly be considered the output of the facility." *Id.* That analysis cohered with the statutory scheme, in FERC's view, because Congress designed PURPA to address utilities' reluctance to purchase power from smaller alternative generation facilities—and to reserve the statute's economic benefits for those facilities alone. *Id.* The Commission therefore concluded that the best interpretation of the 80 MW power production capacity limit refers to the entire facility's net output. *Id.*

Petitioners argue that we should discount the Commission's prior interpretations dating back to *Occidental* because the Commission briefly departed from that position before it reverted on rehearing. We decline to do so. The rehearing requirement "permits the agency an initial opportunity to correct its errors." *Granholm ex rel. Mich. Dep't of Nat. Res. v. FERC*, 180 F.3d 278, 281 (D.C. Cir. 1999). Moreover, a shift in the Commission's position between the initial hearing and rehearing in the same adjudication does not detract from the persuasiveness of the Commission's view.

Petitioners also argue that the Commission incorrectly conflates Broadview's production capacity with its transmission capacity. They suggest "capacity" must refer to the facility's generation or production capacity, because if Congress intended to refer to delivery capacity or output capacity, it would have used those terms. Pet. Supp. Br. 13. For example, Petitioners point to other sections of PURPA that use the phrase "transmission capacity" to refer to a facility's ability to transmit or deliver power to utilities. *See* Pet. Supp.

15

Br. 13; Edison Electric Br. 28 (citing Pub. L. No. 95-617 §§ 202, 203, 92 Stat. 3117, 3135-38 (1978)).

The Commission persuasively rejected that argument on rehearing, recognizing that the concepts of production and transmission are overlapping in this context, where the statutory focus is on the amount of usable power a facility can deliver at any given time. 174 FERC ¶ 61,199, at 61,797. That makes sense. As we have explained, "power production capacity" refers to the amount of power the facility sends out to the electrical grid. Industry-specific reference materials reflect the close relationship between the concepts of producing energy and delivering it for use. *See Generator Capacity*, U.S. Energy Info. Admin., https://perma.cc/B8US-6MUT (last visited July 8, 2025) (defining "generator capacity" as "[t]he maximum output, commonly expressed in megawatts (MW), that generating equipment can supply to system load, adjusted for ambient conditions"); *Load (electric)*, U.S. Energy Info. Admin., https://perma.cc/36SM-GVMN (last visited July 8, 2025) (defining "load" as "[a]n end-use device or customer that receives power from the electric system").

Petitioners also point to a much more recent enactment from Congress that defines the term "qualified facility" by referring to its maximum net output, as measured in AC power. Pet. Supp. Br. 13 (citing 26 U.S.C. § 48E(a)(2) (2022)). According to Petitioners, that statute shows that Congress could have explicitly defined "power production capacity" in Section 796(17)(A) of PURPA to refer exclusively to AC power if that was its intent. But that does not much help Petitioners. *See, e.g.*, *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 769 (2023). The new provision's phrasing could just as readily be understood to make explicit a long-held understanding that the capacity of electricity produced to the grid is ordinarily measured as AC power.

16

Having employed the available tools of statutory construction, we hold that section 796(17)(A) is best read to refer to the maximum amount of AC power a facility can deliver to the electrical grid at any one time.

### iii.

Our dissenting colleague agrees that we must account for the entire Broadview facility when we calculate its power production capacity, and that the facility can only deliver 80 MW of AC power to the grid at any given time. But he would calculate the facility's maximum power production capacity by adding the 50 MW of DC power stored by the battery to the 80 MW of inverted AC power delivered to the grid to bring the facility's total power production capacity to 130 MW. Dissenting Op. at 12-13. In his view, the electricity used to charge the battery has to be counted as "power" "produce[d]" by the facility. *Id.* at 8-9.

FERC's reading is the better one for at least two reasons. First, as discussed above, the statute is best read to concern the amount of AC power delivered to the grid for the use of the electric utility. Second, as the Commission explains, the dissent makes an apples to oranges comparison of the power stored in the battery and the power transmitted to the grid. It is undisputed that power production capacity refers to the amount of power that a facility produces to the grid at a given time. When Broadview's solar array is generating enough power to supply 80 MW directly to the inverters and onto the grid, the power stored in the battery cannot be added to enable the facility to send out 130 MW—or, indeed, any amount greater than 80 MW. "When the solar array produces more DC electricity than the inverters can convert to AC electricity, the excess DC electricity will be stored in the battery energy storage system and will not be delivered to the point of

17

interconnection with NorthWestern's grid until a later time."
*Broadview Solar*, 174 FERC ¶ 61,199, at 61,793.  It is only
when the solar array is below maximum capacity (at night or
during cloudy periods) that power will flow from the battery to
the inverters to ensure that the facility is still sending up to a
maximum of 80 MW of inverted power to the grid.
Broadview's maximum of 80 MW of post-inversion AC power
production capacity to send out to NorthWestern's grid
therefore caps the sum of any power that was generated by the
solar array *and* power that came from the battery.  The dissent
therefore proposes an inflated calculation of Broadview's
power production capacity.

**B.**

In their original appeal, Petitioners challenged as arbitrary
and capricious FERC's decisions not to fault Broadview for
errors on one of its form submissions, to treat the solar array
and the battery as a single facility, and to count the facility's
instantaneous net power output rather than its power output
over time.  We rejected those challenges, *see Solar Energy*, 59
F.4th at 1294-95, and as to them Petitioners sought no further
review.  "When the Supreme Court vacates a judgment of this
court without addressing the merits of a particular holding in
the panel opinion, that holding 'continue[s] to have
precedential weight, and in the absence of contrary authority,
we do not disturb' it."  *U.S. v. Adewani*, 467 F.3d 1340, 1342
(D.C. Cir. 2006) (quoting *Action All. of Senior Citizens of
Greater Philadelphia v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir.
1991)).  Because the Court's remand "for further consideration
in light of" *Loper Bright* has no bearing on those issues, we
reinstate our analysis and holding as to them.  *Edison Elec.*, 144
S. Ct. 2705.

18

The same goes for the prior panel's dismissal of then-petitioner SEIA for failure to demonstrate an Article III injury-in-fact to support its standing.  SEIA did not seek further review.  Our prior holding that SEIA lacked standing to intervene, 59 F.4th at 1295, is also unaffected by the Supreme Court's decision to grant review, vacate our prior decision, and remand for further consideration of Edison and NorthWestern's petitions in light of *Loper Bright*.  SEIA on remand does not ask us to revisit our decision sustaining FERC's denial of its motion to intervene, and instead appears before us as *amicus curiae*.  We therefore reinstate the portions of our prior opinion addressing the Commission's decision to deny SEIA's motion to intervene.

\*\*\*

For the foregoing reasons, we deny the petitions for review.

*So ordered.*

WALKER, *Circuit Judge*, concurring in part and dissenting in part:

The Public Utility Regulatory Policies Act requires utility companies to purchase power from small facilities that produce solar power.  It defines them as facilities with a "power production capacity" of no more than 80 megawatts.[1]

Broadview produces solar power.  At its peak, it can produce up to 130 megawatts of useful power.  So it is not a "small facility."

Because the Federal Energy Regulatory Commission concluded otherwise, I would grant the petitions for review, vacate the rehearing orders, and remand to FERC for reconsideration.

## I. Background

## A. The Public Utility Regulatory Policies Act

The Public Utility Regulatory Policies Act encourages companies to produce renewable energy.[2]

To achieve that goal, the Act gives extraordinary benefits to "small power production facilit[ies]."[3]  Those facilities produce electricity from "biomass, waste, renewable resources, [or] geothermal resources."[4]  The Act exempts them from

---

[1] 16 U.S.C. § 796(17)(A)(ii).

[2] *See id.* § 824a-3(a); *see generally FERC v. Mississippi*, 456 U.S. 742, 745-46, 750-51 (1982) (describing the Act's history).

[3] 16 U.S.C. § 796(17)(A).

[4] *Id.* § 796(17)(A)(i).

2

several regulatory burdens.[5]  And it guarantees them a viable market by forcing public utilities to buy power that small facilities produce.[6]

Requiring public utilities to purchase all the power produced by small facilities is strong medicine.  It can force them to buy power that they do not need or to buy power at an above-market price.  That cost is passed on to consumers.[7]

Thus, the Act's definition of "small facility" plays a key role in the statutory scheme: It keeps the mandatory-purchasing regime within bounds.  The broader the definition of "small facility," the greater the number of power plants that get special regulatory treatment under the Act.

The Act defines "small facility" as a "facility" with a "power production capacity" of no more than 80 megawatts.[8]

**B. Broadview's Design**

Founded by a venture-capital company that has raised more than $47 billion,[9] Broad Reach Power is one of the "largest

---

[5] *Id.* § 824a-3(e)(1) (directing FERC to make rules exempting "small power production facilities" from regulation under various statutes).

[6] *Id.* § 824a-3(a)(2), (b).

[7] *Powering America: Reevaluating PURPA's Objectives and its Effects on Today's Consumers: Hearing Before the H. Subcomm. on Energy & Commerce*, 115th Cong. 84 (2017) (testimony of Terry L. Kouba, Vice President, Alliant Energy).

[8] 16 U.S.C. § 796(17)(A)(ii).

[9] *About Our Company*, EnCap Investments, perma.cc/T9G5-LQ2Z (last visited Aug. 14, 2025).

3

standalone energy storage companies in the U.S."[10]  It makes solar and wind energy in California, Montana, Texas, Utah, and Wyoming.  Its complex in Montana's Yellowstone County cost at least $2 billion to build.

In 2019, the Montana Complex could deliver 620 megawatts of power.[11]  That is only slightly less than the amount of power produced by the Hoover Dam when it became the world's largest hydroelectric facility in 1939.[12]

In 2019, the Montana Complex contained four separate but similar solar-power projects.[13]   One of them is called Broadview I.

Broadview includes a solar array, a battery, and inverters. With 470,000 solar panels, its solar array produces up to 160 megawatts of direct-current power.  The battery stores some of those megawatts.  And the inverters convert up to 80 megawatts from DC power to alternating-current power. Because the electric grid accepts only AC power, inversion readies the power for the grid to receive it.

Depending on the time of day, Broadview's components serve different purposes.  During the day, the solar array sends 80 megawatts of power to the inverters and charges the battery. But at night, it cannot generate power.  That's when the battery matters most.  At night, the battery sends stored power to the

---

[10] *Broad Reach Power Acquired by Engie from EnCap Energy Transition and Apollo Funds*, EnCap Investments (Aug. 24, 2023), perma.cc/X9N3-NTCU.

[11] Edison Br. 12.

[12] *The Story of the Hoover Dam*, Bureau of Reclamation (July 13, 2022), perma.cc/6JWN-BY77.

[13] Edison Br. 12.

4

inverters and then on to the grid.  With the battery, Broadview can deliver more power to the grid than it could without it.

## C. FERC's Decision

In 2019, Broadview asked FERC to certify it as a "small facility."  It argued that its "power production capacity" was not greater than 80 megawatts because its inverters can send only 80 megawatts to the grid at once.[14]

FERC initially denied Broadview's application, but it reversed course on rehearing.[15]  According to FERC, "power production capacity" means the "maximum output that the facility can produce for the electric [grid]."[16]

Two intervenors, NorthWestern Energy and the Edison Electric Institute, petitioned for this Court's review.  If

---

[14] 16 U.S.C. § 796(17)(A)(ii).

Because Broadview is more than one mile apart from the other facilities in the Montana Complex, FERC analyzes it separately under the small-facility rule.  18 C.F.R. § 292.204(a)(1)-(2); *see also* Order re. Broadview Solar III, 2021 WL 3641570 (Aug. 13, 2021) (accepting withdrawal of an application for small-facility status for another plant in Montana Complex).

[15] The majority repeatedly says that FERC has interpreted the Act "consistently" over the years.  *See* Majority Op. 3, 12.  But FERC's interpretation was not even consistent from hearing to rehearing in this case.  *See id.* at 6 (before reversing itself on rehearing, FERC "denied Broadview's application for certification, concluding that the facility exceeded the 80 MW statutory limit for 'power production capacity'" by "finding . . . that the relevant capacity was that of the solar array — 160 MW)"; *id.* at 13 ("FERC's initial decision in this case repudiated its 'send out' approach, only to revert on rehearing to its longstanding reading of the statute." (cleaned up)).

[16] JA 201.

5

Broadview is a small facility, the Public Utility Act's mandatory-purchasing rule will force NorthWestern and some of Edison's members to buy Broadview's power — even if they don't need it.

In 2023, this court denied the intervenors' petitions. Applying *Chevron v. Natural Resources Defense Council*,[17] it held that the Public Utility Act's terms "facility" and "power production capacity" were ambiguous and that FERC's interpretation was reasonable. In dissent, I argued that the Public Utility Act unambiguously precludes FERC's interpretation.

NorthWestern and Edison Electric petitioned for certiorari. Before deciding whether to grant the petition, the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*.[18] The Court then granted the petition, vacated our judgment, and remanded for further consideration in light of *Loper Bright*.[19]

Because I concluded last time around that FERC's interpretation conflicted with the Act's unambiguous meaning, my analysis today looks a lot like my analysis then. Even before the Supreme Court overruled *Chevron*, absence of statutory ambiguity meant that FERC deserved no *Chevron* deference, so I applied what I believed to be the best reading of the statute. Now that no agency gets *Chevron* deference and we are required to always apply the best reading of the statute, I once again would grant the intervenors' petitions.

_____

[17] 467 U.S. 837 (1984).

[18] 603 U.S. 369 (2024).

[19] *Edison Electric Institute v. FERC*, 144 S. Ct. 2705 (2024).

6

## II. Broadview Is Not a "Small Facility"

Broadview is not a "small facility" under the Public Utility Act because its "power production capacity" is greater than 80 megawatts.

### A. "Facility"

Start with the term "facility."[20]  A facility is "something . . . that is built, installed, or established to serve a particular purpose."[21]  The statute's focus on a "facility" suggests that we should assess the production capacity of a power plant *as a whole*, not the capacity of an individual component.

That rules out a few possibilities.

First, it tells us that we should not look only at the capacity of Broadview's 160-megawatt solar array.  That approach would ignore the facility's other components — for instance, the inverters that limit the array's output to the grid.  (On this, the majority and I agree.)

Second, it tells us that we should not exclude the power used to charge the facility's battery.  The battery is part of the facility.  So refusing to count power that the solar array sends to the battery fails to give full meaning to the word "facility." (On this, the majority and I disagree.)

FERC says we shouldn't count power sent to the battery because it is "not useful to anybody."[22]  But a battery like Broadview's lets a solar facility send power to the grid at times

---

[20] 16 U.S.C. § 796(17)(A).

[21] Facility (def. 4b), *Webster's New Collegiate Dictionary* (1977).

[22] *See* Oral Arg. Tr. 31.

7

when it otherwise could not.  By allowing the facility to deliver power at night, the battery "increase[s] [Broadview's] ability to provide reliable and/or timely service to . . . customers."[23]

The battery power also makes Broadview more efficient. A solar-power facility without a battery sends to the grid "approximately 25 to 30 percent" of the maximum power its array could theoretically generate each day.[24] With the battery, Broadview sends "approximately 35 to 40 percent,"[25] because it is "capable of sustaining its maximum output for additional hours in the day."[26]  That increased efficiency makes the facility more profitable.[27]

The power on the battery is useful to Broadview's customers, too.  It's stored on the battery for their later use. True, Broadview's customers aren't using the power stored on the battery in that moment.  Nor is the power yet available for their use.  But the statute doesn't direct us to the moment of use or availability.  It directs us to the moment of production.

In short, the battery power is quite useful.  It lets Broadview make more money by prolonging its maximum output.  And it will eventually go out to Broadview's customers for their use.

---

[23] JA 54 (Pasley Affidavit).

[24] *Id.*

[25] *Id.*

[26] JA 23.

[27] *See* Christopher Cerny, *A Broad View of Broadview Solar: How FERC's Whiplash-Inducing Orders Expand the Scope of PURPA*, 23 Minn. J.L. Sci. & Tech. 363, 406 (2022).

8

## B. "Power Production Capacity"

Turn next to the phrase "power production capacity."

### 1. "Power"

Power means "a source or means of supplying energy, especially[ ] electricity."[28]  "Power" includes both DC power and AC power.[29]  So both the DC power used to charge the battery and the AC power sent directly to the grid count as "power."

Yet FERC claims that only the 80 megawatts of AC power sent to the grid should count as Broadview's power-production capacity.[30]  That adds an atextual limit that Congress didn't adopt.  The Public Utility Act says "power production capacity," not "AC power production capacity."  And Congress is perfectly capable of saying "AC" when it wants to.[31]

---

[28] Power (def. 6a), *Webster's New Collegiate Dictionary* (1977).

[29] *See Chemehuevi Tribe of Indians v. Federal Power Commission*, 489 F.2d 1207, 1217 (D.C. Cir. 1973) (discussing history of power transmission).

[30] *Cf.* Majority Op. 16 ("we hold that section 796(17)(A) is best read to refer to the maximum amount of AC power a facility can deliver to the electrical grid at any one time").

[31] *See, e.g.*, 26 U.S.C. §48E(a)(2)(A)(ii) (defining a "qualified facility" as one "with a maximum net output of less than 1 megawatt (*as measured in alternating current*))" (emphasis added).

9

## 2. "Production"

After "power" comes "production."   To "produce" something is to "bear, make, or yield something," or to "cause [it] to accrue."[32]  Another apt synonym is to "generate."[33]

Broadview creates the power sent to its battery; it causes that power to accrue.  Before the sun's rays hit Broadview's array, the battery is empty.  It is charged when the facility converts solar energy into useful power.  If Broadview did not "produce" the power used to charge the battery, what did?[34]

Consider what happens when the battery charges. Broadview uses a lithium-ion battery.  Charging that battery prompts a chemical reaction, causing lithium ions to move within the battery.[35]  Without power, that chemical reaction could not happen.  So Broadview must "produce" the power used to charge the battery.

---

[32] Produce (def. 6), *Webster's New Collegiate Dictionary* (1977).

[33] *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1171-72 (2021) (noting the "close[ ] connect[ion]" between the verb "produce" and the noun "generator").

[34] Some power at facilities like Broadview is lost to inefficiencies during production.  FERC allows power plants to deduct those "electrical losses" from their power production capacity.  *See* JA 210. So if Broadview had a 160-megawatt array, 80-megawatt inverters, and no battery, it would count as a "small facility" — albeit an inefficient one that loses half of its potential output during production.

[35] *How Does a Lithium-Ion Battery Work?*, Energy.gov (Sept. 14, 2017), perma.cc/CUA8-Y9UK (during charging "[l]ithium ions are released by the cathode and received by the anode").

10

### 3. "Capacity"

In the statute's context, "capacity" means "the maximum amount of power that the facility can produce."[36]

But here, FERC rewrites the statute. It says "capacity" includes only the power that a facility supplies to the electric grid. Yet that changes "power production capacity" to "power delivery capacity." And the word "production" means something different from "delivery."[37]

FERC's interpretation is at odds not only with the meaning of the statute but also with a concession FERC made at oral argument. There it said that "power production capacity" would likely include power never delivered to the grid if it is used "on site" for a "useful" purpose like powering an on-site factory.[38] But if so, "power production capacity" cannot mean

---

[36] *Solar Energy Industries Association v. FERC*, 59 F.4th 1287, 1292 (D.C. Cir. 2023); *see also* Capacity (def. 1c), *Webster's New Collegiate Dictionary* (1977) (defining "capacity" as "maximum production or output").

[37] *See* Deliver (def. 5), *Webster's New Collegiate Dictionary* (1977). ("[T]o send . . . to an intended target or destination.").

FERC conflated "production" and "delivery" in its rehearing order, although its counsel wisely retreated from that approach on appeal. *Compare* JA 201 (FERC: "'production' and 'delivery' . . . are overlapping"), *with* Oral Arg. Tr. 33 (FERC: "we're not talking about delivery"); *id.* at 37 ("[Y]ou're not depending on a conflation of the words production and delivery — right? [FERC:] Correct.").

[38] Oral Arg. Tr. 30; *but see* Majority Op. 16 ("we hold that section 796(17)(A) is best read to refer to the maximum amount of AC power a facility can deliver to the electrical grid at any one time"); *id.* at 17 ("It is undisputed that power production capacity refers to the amount of power that a facility produces to the grid at a given time.").

11

only "the amount of power that a facility produces *to the grid* at a given time."[39]

FERC's concession highlights the problem with FERC's decision in this case: Charging a battery like Broadview's *is* a useful purpose. Far more salient than whether power produced by a facility goes straight to the grid is whether the power is sent by the facility to people who will use it. They could be the owners of an on-site factory, operators of a next-door data center, or the purchaser of energy that was stored in the battery before being sold on the grid. In all three instances, the produced power has a useful purpose, so in all three instances, the produced power should — by FERC's own reasoning — count toward a facility's "capacity."

Broadview argues that the words "capacity" and "production" carried a "specialized industry usage" when Congress passed the Public Utilities Act. But Broadview does not provide a single technical or specialized dictionary that defines "power production capacity" as "power delivery capacity." FERC quotes the Department of Energy for a "technical, industry-specific definition of 'capacity.'"[40] But FERC does not say when the Department published the definition, nor does it provide any evidence that Congress intended to incorporate it into the Act. Though Congress sometimes uses terms that carry a specialized meaning, the general rule is that "ordinary meaning" controls absent evidence to the contrary.[41] And "FERC has now issued three

---

[39] Majority Op. 16 (emphasis added).

[40] FERC Br. 10.

[41] *Heating, Air Conditioning & Refrigeration Distributors International v. EPA*, 71 F.4th 59, 67-68 (D.C. Cir. 2023).

12

orders and filed three appellate briefs, none of which contain a single dictionary definition of 'production.'"[42]

## C. Broadview's "Power Production Capacity"

Putting "power" and "production" and "capacity" together, "power production capacity" is the maximum amount of usable power that it can produce at a given moment. For Broadview, that means power that reaches the grid. Sometimes Broadview's power goes straight from the solar array to the inverters to the grid — and sometimes the power makes a detour from the solar array to the battery before going to the inverters and to the grid.[43]

With both routes, Broadview has the capacity to produce 130 megawatts of power for the grid. At the moment of generation, in optimal daytime conditions, 80 megawatts of AC power can be delivered to the inverters and grid immediately, and 50 megawatts of DC power can be stored for later delivery at night.[44] Because "power" includes AC and DC power, Broadview's power production capacity is the sum of the two:

$$80 + 50 = 130$$

---

[42] FERC Supp. Reply 2-3.

[43] *See* Majority Op. 11 ("the facility can send out previously generated power stored in the battery").

[44] The record is unclear on the amount of power the battery can receive from the array. But the parties agree that the battery can take in up to 50 megawatts. *Compare* Edison Br. 10 n.3 ("The Broadview Project's battery can be charged at the same rate as it discharges — i.e., it can receive and send out 50 megawatts of energy each hour."), *with* FERC Br. 14 ("[U]p to 50 megawatts of power is diverted to battery storage for later release.").

13

Contrary to FERC's argument, this calculation does not double-count power stored in batteries. I count usable power only once — when it is produced by the solar array and sent either to the inverters and grid or to the battery. In contrast, FERC views Broadview's power production capacity as 38% lower[45] than it actually is, based on a distinction (found nowhere in the statutory text) between (a) power sent straight to the inverters and grid and (b) power sent first to the battery before it goes to the inverters and ends up on the grid.

In short, the 50 megawatts produced by Broadview for usable energy (and sent first to the battery) should be counted just like the other 80 megawatts produced by Broadview for usable energy (and not sent first to the battery). That gives Broadview a power production capacity of 130 megawatts. And because the power production capacity of a "small facility" cannot exceed 80 megawatts, Broadview is not a "small facility."[46]

### III. Conclusion

This case has come before this court twice. Despite its plea for *Chevron* deference, FERC was wrong before, and now that *Chevron* deference is verboten, FERC remains wrong today.

---

[45] $50 \div 130 = 0.38$

[46] 16 U.S.C. § 796(17)(A).

I do not share the majority's confidence that it serves the Public Utility Act's "statutory purpose" (Majority Op. 11) and "Congress's stated goal of boosting small-scale solar power facilities" (*id.* at 12) to confer a market advantage on the component (Broadview I) of a complex (the Montana Complex) that can deliver 620 megawatts of power and that was built at a cost of at least $2 billion by one of the nation's largest standalone energy storage companies, which was founded by venture capitalists who have raised $47 billion.

14

Because Broadview can send 80 megawatts to the grid while it simultaneously sends 50 megawatts to its battery before later sending those 50 megawatts to the grid, Broadview's facility is capable of producing more than 80 megawatts of power — which makes Broadview too large to be a "small facility."

I would grant the petitions, vacate the rehearing orders, and remand to FERC for reconsideration.[47]

---

[47] Like last time, I agree with the majority that Solar Energy lacks standing to challenge FERC's denial of its motion to intervene.